THE STATE OF FLORIDA *ex rel.* JOSEPH J. KITTEL, *Relator,* v. W. S. JENNINGS, GOVERNOR, *et al.,* TRUSTEES OF THE INTERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA, *Respondents.*

1. A demurrer to the return to an alternative writ of mandamus is treated as a demurrer in other actions at law.

2. Ambiguity and argumentativeness are defects in a pleading, which at common law were treated as formal defects which

made the pleading subject to special demurrer, but special demurrers are abolished in this State.

3. The act of Congress of March 3rd, 1845, entitled: "An act supplementary to an act for the admission of Florida and Iowa into the Union and for other purposes," granting school lands to Florida was in the nature of a compact between the State, and the United States Government, and was a special grant in presenti of every sixteenth section in every township, which previous to survey had not been disposed of under legal authority from the government of the United States, and when by survey a sixteenth section, or fractional part thereof, is ascertained to exist in any township, the grant immediately attaches thereto, without a patent, by relation back to the date of said act of Congress.

4. The north and west boundary lines of a fractional township, and the traverse of the Apalachicola river on the east and of Lake Wimico on the south of said township were surveyed in 1852, and the survey was approved by the Surveyor General of Florida on the 16th of September, 1853, and the boundary lines of the sections and lots in said township were extended in 1884, and the boundaries of fractional section sixteen in said township were definitely located, and said fractional section was divided into lots which were numbered, and the acreage in each lot was ascertained by the Surveyor General, and a record thereof was made in 1884 in the Surveyor General's office. *Held*: The foregoing survey, and acts of the Surveyor General, showing the existence of fractional section 16 and its acreage were sufficient to cause the grant of March 3rd, 1845, to immediately attach to said fractional section 16 as school land.

5. The act of Congress of September 28th, 1850, entitled an act to enable the State of Arkansas and other States to reclaim the swamp lands within their limits, and the act of Congress of March 3rd, 1857, confirming selections of swamp lands made before that date are construed not to apply to nor embrace the sixteenth sections granted to the State of Florida by the act of Congress of March 3rd, 1845, for school purposes.

6. The selection of an entire fractional township, embracing a fractional sixteenth section as swamp and overflowed land, by the executive officers of the State, and the confirmation of such selection by the act of Congress of March 3rd, 1857, are construed as not to include the fractional sixteenth section, and a certificate made by the Trustees of the Internal Improvement Fund of Florida, made and delivered on March 16th, 1889

VOL. 47, JANUARY TERM, 1904.          309

State *ex rel.* Kittel v. Trustees I. I. Fund.—Statement of Case.

to a railroad company, certifying that such company was entitled to such sixteenth section as swamp and overflowed land whenever said lands should be patented to the State, and promising to convey said sixteenth section to said railroad company, its successors or assigns, upon the receipt of a patent for same by the State, are under the circumstances before stated, void acts; and the patent of the same by the executive officers of the government of the United States to the State, as swamp and overflowed land, is also a void patent, and these acts confer no power or authority upon the trustees of the Internal Improvement Fund to convey said fractional section sixteen, to the said railroad company, its successors or assigns, as swamp and overflowed lands.

This case was decided by Division A.

This is a case of original jurisdiction.

### *Statement.*

After the demurrer of the respondents was overruled they filed an amended answer to the alternative writ setting up substantially the following facts: They admit that on September 28, 1850, the United States by act of Congress did grant to the State of Florida all swamp and overflowed lands in said State which remained unsold at the passage of the act, for the purposes of reclamation and drainage, and that the State of Florida was authorized to designate and select the land of the kind and description thus granted, and to report the same to the General Land Office for patent as required by the act; but deny that this grant included section 16, township 8 south, range 8 west, here in controversy, or any part thereof. They allege they have no information other than is stated by the relator that on September 17, 1853, the Surveyor-General of the State of Florida transmitted to the General Land Office the township plat of fractional township 8 s., range 8 w., and that said township plat was approved by the Surveyor-General September 16, 1853, and that on January 25, 1854, the State of Florida

through her competent officers designated and selected under the provisions of said act of September 28, 1850, a portion of such swamp and overflowed land referred to in said act, but deny that the land so designated and selected included the entire fractional township 8 south, range 8 west, and say that said selection did not include section 16, township 8 s., range 8 west, or any part thereof. They admit that by the act of Congress of March 8, 1857, the United States confirmed certain selections of land lawfully made and reported before that date, to the Commissioner of the General Land Office of the lands granted to the State by the act of Congress of September 28, 1850, but allege that said act of Congress of March 3, 1857, did not confirm to the State any land that had not been granted to the State by the act of Congress of September 28, 1850, and respondents deny that said lists so confirmed by said act of Congress of March 3, 1857, included or was intended to include fractional section 16, township 8 south, range 8 west, or any part thereof, and that said fractional section 16 was granted to the State of Florida by said act of Congress of September 28, 1850.

Respondents admit the execution by their predecessors, as trustees, of certificate No. 13,909, but say that said certificate was not executed by the trustees of the Internal Improvement Fund in the discharge of any legal power, duty, trust or authority, conferred upon them by law, and allege that there was and is no law authorizing the giving of such certificate, and further say that if said certificate be valid for any purpose it does not include, and was not intended by the trustees to include, fractional section 16 here in controvery, or any part thereof; since said fractional section 16 had been granted to the State for other purposes by the act of Congress of March 3, 1845, and was lawfully in the possession of the State Board of Education, and that it was not necessary to expressly exclude it in describing generally by townships, the lands intended to be included in said certificate; that a record of all certificates and deeds

VOL. 47, JANUARY TERM, 1904.        311

State *ex rel.* Kittel v. Trustees I. I. Fund.—Statement of Case.

executed by the trustees of the Internal Improvement Fund is kept in the office of the Commissioner of Agriculture, and that when a certificate or deed is issued by said trustees, the number of such certificate or deed is endorsed or entered upon the sections or lots of land so certified or deeded, as they appear upon official maps or plats kept as the records of said office; that when certificate No. 13,909 was executed, the number thereof was endorsed on each and every section or fractional section of township 8 south, range 8 west, as they appear on the official map or plat of said township in said office, except fractional section 16 of said township, upon which said certificate was not endorsed or entered. A certified copy of said map is filed, marked exhibit B.

They admit that a patent was received in July, 1895, in the State Land Office for fractional section 16 in controversy, but allege that no title was passed to or confirmed in the State of Florida, or the trustees of the Internal Improvement Fund by said patent, as the title to said fractional section had passed from the United States and vested in the State of Florida for school purposes, under the act of Congress of March 3, 1845. They admit that neither John A. Henderson nor Sidney I. Wailes has any right, title or claim to the said fractional section.

Respondents further say that at the time of the institution of this suit the Cypress Lumber Company was in possession of said land under conveyances from the State by the State Board of Education. They admit the ownership by relator of certificate numbered 13,909, and that relator in the years 1896-7, and particularly in 1898, made due request and demand of the Internal Improvement Board at their office at Tallahassee, Florida, for a conveyance to him of the fractional section 16, containing as estimated 309 acres, and that said request was denied, and is still denied; but they deny that said fractional section 16 is unsurveyed, and deny that relator is entitled to a conveyance of the same, according to the promise contained in certificate No. 13,909.

Respondents admit that the refusal to make the conveyance demanded was and is for the reason that said fractional section 16 has been surveyed, and was school land, and say that by the act of Congress of March 3, 1845, the title thereto was vested in the State of Florida for school purposes, and that it was sold and conveyed by the State Board of Education as authorized by law, and therefore was not and is not subject to disposition and conveyance by respondents; and that the trustees of the Internal Improvement Fund have never had any title to, or control over, or authority to convey said land. They deny that fractional section 16 is unsurveyed in fact and in law; that an actual local physical survey thereof is required by law as a condition precedent to the vesting of the title in the State for school purposes, and allege that said fractional section, long prior to the issuing of certificate 13,909, had been definitely located and ascertained, and possession thereof taken, and ever since held by the State Board of Education and parties claiming under said board; that no disposition or appropriation of said fractional section has been made by the United States, other than by the act of Congress of March 3, 1845, for school purposes.

Respondents further answering allege that by the act of Congress of March 3, 1845, entitled "An act supplementary to an act for the admission of Florida and Iowa into the Union, and for other purposes," the United States, in consideration of the concessions made by the State of Florida in respect to the public lands, granted to said State section 16 in every township, or other lands equivalent thereto, for the use of the inhabitants of such township for the support of public schools; that the law requires no patent to said sections; that the law does not require an actual local survey to be made of every section 16 before the title vests in the State; that the act of Congress above mentioned was a grant *in presenti,* and vested the title to each and every section 16 in the State not otherwise disposed of on March 3, 1845, in the State for school purposes; that each and every section

VOL. 47, JANUARY TERM, 1904.        313

State *ex rel.* Kittel v. Trustees I. I. Fund.—Statement of Case.

16 was by the constitution and laws of Florida vested in the State Board of Education, with power to convey title thereto and deliver possession thereof; that said fractional section 16 has not been otherwise disposed of by the United States; that the north and west boundary lines of fractional township 8 south, range 8 west, and the traverse of the Apalachicola river on the east, and of Lake Wimico on the south of said township, were surveyed in 1852 by H. Wells, Deputy Surveyor, and said survey was approved September 16, 1853, by John Westcott, Surveyor-General of Florida; that the boundary lines of the sections and lots in said township were extended in 1884, and the boundaries or fractional section 16 in said township were definitely located, and said fractional section 16 was divided into lots which were numbered 1, 2, 3, 4 and 5, and the acreage of each lot was ascertained by the Surveyor-General of Florida, and a record thereof was made in the Surveyor-General's office, and a certified copy of the diagram kept in the office of the United States Surveyor-General for Florida, showing the same, is filed as a part of this answer; that on May 11, 1892, the State Board of Education, for a valuable consideration, sold said fractional section 16 to C. J. M. Shine, and afterwards made a confirmatory deed thereof to the Cypress Lumber Company, a corporation, and that said Cypress Lumber Company, by its agents and officers, were since the date of filing this suit, and now are, in peaceable possession thereof.   Respondents further say that, as trustees of the Internal Improvement Fund, they only have power and authority to execute conveyances to lands granted to the State of Florida for drainage and internal improvement purposes under the acts of Congress of September 28, 1850, and September 4, 1841, and that they have no lawful power and authority to convey any other lands, and that fractional section 16, in the controversy, was not conveyed to the State of Florida by either of those acts.

We deem it unnecessary to set forth the exhibits filed with the answer.

314        SUPREME COURT OF FLORIDA,

State *ex rel.* Kittel v. Trustees I. I. Fund.—Statement of Case.

The relator demurred to the original answer, and in argument the demurrer is treated as applying to the amended answer.

In the demurrer the relator says that the answer is bad in substance, does not state facts which in law constitute a defense to the allegations of the alternative writ, and is uncertain, evasive, argumentative and otherwise insufficient, and states substantially the following matters of law intended to be argued:  1.  That the second and third paragraphs of the alternative writ are not sufficiently answered by saying "respondents, for lack of information, do not admit, but, being trustees, demand strict proof thereof;" that such answer is in law not a denial, but an admission, of said allegations.

2.  That the denial of respondents that the lists of lands confirmed by the act of Congress of March 3, 1857, included, or were intended to include, section 16, township 8 south, of range 8 west, or any part thereof, is uncertain, insufficient and evasive, as there is no positive denial of the specific allegation of the alternative writ that the entire fractional township 8 south, of range 8 west, was selected and certified as swamp and overflowed lands, and said selection confirmed by said act of March 3, 1857.

3.·  That the denial of respondents that certificate No. 13,909 included, or was intended to include, section 16 is argumentative, evasive and insufficient for the reason that the alternative writ specifically alleges, and the answer does not deny, that said certificate included all the unsurveyed part of township 8 south, of range 8 west.

4.  That it is no answer to the sixth paragraph of the alternative writ to admit the issue and receipt of patent No. 109, but "to demand strict proof that it was received pursuant to the request of the Governor of the State of Florida," and to aver it passed no title to the trustees for the reason that such demand of proof is in law an admission of the fact alleged, and the averment that no title passed is a conclusion of law from the pleader's argument.

VOL. 47, JANUARY TERM, 1904.        315

State *ex rel.* Kittel v. Trustees I. I. Fund.—Opinion of Court.

5. That it is no sufficient answer to, but an admission of, the allegations in the eighth and ninth paragraphs of the alternative writ to demand strict proof thereof.

6. That respondents do not deny explicitly and positively the allegations of the alternative writ that section 16 is unsurveyed land, nor the positive averment that as a fact said fractional section 16 has never been actually surveyed; but say evasively and argumentatively that the survey of the exterior boundaries was a sufficient survey to enable the sixteenth section to be definitely located, and that as shown by a diagram the boundary lines of sections were extended in 1884, which averments. are consistent with the truth of, and do not deny, the positive allegations of the alternative writ.

7. That all the argumentative statements that section 16 is school land claimed adversely by the State School Board and its grantees, and that the Internal Improvement Trustees have never had any title thereto, are irrelevant matter and conclusions of law which neither deny nor confess and avoid the material allegations of the alternative writ.

8. That said answer as a whole is uncertain, evasive, argumentative and insufficient, and does not traverse and deny nor confess and avoid the material allegations of the alternative writ.

*Henry H. Ingersoll* and *T. L. Clarke* for relator.

*Geo. P. Raney* and *J. B. Whitfield,* Attorney-General, for the State.

HOCKER, J. (*after stating the facts*).—In the case of *Camp v. Hall,* 39 Fla. 535, 22 South. Rep. 792, this court in discussing the functions of a demurrer in a common law action said: "In pleading, if the matter pleaded be in itself insufficient without reference to the manner of pleading it, the defect is one of substance; but if the only fault is in

the form of alleging the matter, the defect is formal."
(7th headnote.) "In this State special demurrers in com-
mon law actions have been abolished, and no advantage can
be taken of any defect which could formerly be reached
by special demurrer only, *i. e.,* defects of form, unless in a
proper case by motion to strike out or amend the pleading
as being so framed as to prejudice, embarrass or delay the
fair trial of the action, under sec. 1043, Rev. Stats." (8th
headnote.)

A demurrer to an alternative writ of mandamus is
treated as a demurrer in other. actions at law. *State ex rel.
Fowler v. Finley,* 30 Fla. 302, text 310, 11 South. Rep. 500;
13 Ency. Pl. & Pr., 698.

The demurrer in this case, as before stated, was filed
to the original answer, and after it was filed the respondents,
with leave, filed their amended answer. It was insisted in
the oral argument of this demurrer that it should be treated
as applicable to the amended answer. Ambiguity and argu-
mentativeness are defects in pleading which at common
law were treated as formal defects and were reached by
special demurrer. 6 Ency. Pl. & Pr. 308; *Camp. v. Hall,*
39 Fla. 535, text 569, 22 South. Rep. 792; 7 Bacon's Ab-
ridg. (1876 by Bouvier) 668 *et seq.; Willey v. Carpenter,*
64 Vt. 212, 23 Atl. Rep. 630. Special demurrers, as has
been seen, are abolished in this State.

There is no doubt that a return to an alternative writ
should, for the purpose of making an issue, set up a positive
denial of the facts stated, or should state facts in confession
and avoidance with such precision and certainty that the
court may be fully advised of all the particulars necessary
to enable it to pass judgment upon the sufficiency of the
return, and that it should not be evasive. *State ex rel.
Patten. v. Bloxham,* 33 Fla. 482, 15 South. Rep. 227; *Ray
v. Wilson,* 29 Fla. 342, 10 South. Rep. 613; *State ex rel.
Citizens' Gas Light Co. v. Mayor, etc., of Jacksonville,* 22
Fla. 21; *Canova et al., Commissioners of Baker Co. v.
State ex rel. Commissioners of Bradford Co.,* 18 Fla. 512.

Many, however, of the objections to the original answer contained in the first seven grounds of the demurrer have been met and obviated in so far as they could be said to be substantial and not formal, by the amended answer, and those that are purely formal we are precluded from considering by the principles of law above set forth. The demurrer, however, presents the question whether the answer in its allegations shows any defense to the alternative writ, and proceeding on the principle that all the allegations of the alternative writ, which are well pleaded, and not denied by the answer, are to be taken as true (13 Ency. Pl. & Pr. 734) we will endeavor to determine that question. By way of premise it is proper to say that the Internal Improvement Fund was created by chapter 610, laws of Florida, 1855, brought forward into the Revised Statutes in sec. 428 *et seq.* The swamp and overflowed lands granted to the State by the act of Congress of September 28, 1850, among other lands, were set apart and declared a part of that fund. The trustees of said fund are designated by sec. 429, Rev. Stats., and their general powers and duties are there enumerated.

The State Board of Education is created a corporation by sec. 3, Article XII of the constitution. The sources of the State school fund are designated in section 4 of said Article, and among them are the "proceeds of all lands that have been or may hereafter be granted to the State by the United States for public school purposes." The powers and duties of the State Board of Education are set forth in secs. 234 and 235 of the Revised Statutes. Under the last mentioned section it is directed and empowered "to obtain possession of and take the charge, oversight and management of all lands granted to or held by the State for educational purposes, and to fix the terms of sale, rental or use of such lands, and to do whatever may be necessary to preserve them from trespass or injury, and for their improvement."

The main questions presented by the demurrer to the answer are: first, whether the act of Congress of March 3, 1845, entitled "An act supplementary to an act for the admission of Florida and Iowa into the Union, and for other purposes," granting the sixteenth section in every township to the State of Florida for the use of the inhabitants of such township for the support of public schools, is a grant *in presenti*, and, second, whether an actual local survey of such sections is essential to vest the title to the same in the State; third, whether the act of Congress of September 28, 1850, granting swamp and overflowed lands to the State, and the alleged acts of the executive officers of the State and United States Government and the confirmatory act of Congress of 1857, had the effect to deprive the State of its title to the fractional section 16 in dispute, as school lands, and to invest the State with title thereto as swamp and overflowed lands.

The relevant part of the act of March 3, 1845, is as follows: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that in consideration of the concessions made by the State of Florida in respect to the public lands, there be granted to the said State * * * section number sixteen in every township, or other lands equivalent thereto, for the use of the inhabitants of such township, for the support of public schools." This was a special act and grant, and was accepted by the State of Florida as a compact between said State and the government of the United States, July 25th, 1845 (Laws of Florida, 1845, ch. 14, p. 35; Thompson's Dig., pp. 4 and 5).

On the admission into the Union of many of the other States land grants were made to them by Congress for public school purposes, but none of these grants, so far as we can discover, are framed in language exactly similar to the Florida grant. Some of them are reservations of public land to be granted in the future, as in Indiana and Missouri. The grant to Nevada was construed by the Supreme

VOL. 47, JANUARY TERM, 1904.          319

State *ex rel.* Kittel v. Trustees I. I. Fund.—Opinion of Court.

Court of the United States in *Heydenfeldt v. Daney Gold and Silver Mining Co.,* 93 U. S. 634, not to be a grant *in presenti,* because of words of qualification in the grant and of the peculiar condition of the public lands of the State; and as there was no occasion of making provision for substituted lands at the date of the act, words used in the past tense were construed to have a future meaning (text 639). The grant to California is construed in *Mining Company v. Consolidated Mining Co.,* 102 U. S. 167. The opinion sets forth the peculiar conditions existing in California, and shows that mineral lands were expressly excepted from the grant for school purposes, while conceding that the grant would be one *in presenti* without such words of exception (text 171 and 172).

The department of the Interior has construed the grant to Colorado in accordance with the doctrines of these decisions, and in 15 Dec. Dep. of Interior, 152, quotes from 93 U. S., *supra,* the following: "Until the status of the lands was fixed by survey and were capable of identification, Congress reserved absolute power over them, and if in exercising it the whole or any part of the sixteenth or thirty-sixth section had been disposed of, the State was to be compensated by other lands equal in quantity, and as near as may be in quality. By this means the State was fully indemnified, the settlers ran no risk of losing the labor of years, and Congress was left free to legislate touching national domain in any way it saw fit to promote the public interests." We apprehend, however, that the decisions and rulings construing the school grants in the foregoing and perhaps other States in the west, both because of the language of the grants and the conditions existing at the time they were made, furnish no adequate guide in construing the school grant to Florida made on March 3, 1845.

The act of June 23, 1836, (chap. CXXI) being "An act supplementary to the act entitled an act to establish the northern boundary line of the State of Ohio, and to provide for the admission of the State of Michigan into the union

on certain conditions," contained a grant of school lands in these words: "That section numbered sixteen in every township of the public lands, and where such sections have been sold, or otherwise disposed of, other lands equivalent thereto and as contiguous as may be shall be granted to the State for the use of schools." It is provided that upon the acceptance of the conditions by the legislature of Michigan, the grant was to be obligatory upon the United States. This statute was construed by the Supreme Court of the United States in the case of *Cooper v. Roberts,* 18 Howard 173. The principles of law determined by the case are succinctly stated in the headnotes as follows: "1. The act of Congress authorizing Michigan to organize as a State, like all other similar acts, granted the sixteenth section of every township to the State for school purposes. 2. When the State accepted this act, the grant became a contract or compact between the State and the United States. 3. As the government extended its surveys, so that the location of these sections was ascertained, the title in the State became complete. 4. Neither a lease made by the United States for mining purposes, nor the acts of Congress of March 1, 1847, and September 1, 1850, were intended to or did impair the title of the State to these sections, nor was the consent of Congress necessary to a valid sale by the State."

In this decision the general policy of the government of the United States with regard to the grants of land to the various States for school purposes is set forth. The court explains why the various grants mentioned (and among them that to Florida) contained provisions for giving other lands in lieu of the sixteenth sections. The reason given (text 150) is, that the general policy of setting apart the sixteenth sections for school purposes was, at the time of the admission of the several States into the Union, interferred with by the fact that previous thereto portions of the territory of the States had been encumbered in the articles of cession (as in the cases of Louisiana and Florida), and other portions by Congress in the fulfillment of public obli-

gations.   In the interpretation of the act of 1847, which provided for a geological survey of Michigan for the ascertainment of those containing minerals and providing for the sale of such lands, the court placed a construction upon the act which would prevent a conflict between it and the prior school land grant of 1836, saying "we can not suppose that Congress could be tempted, with the hope of a small additional price which is imposed upon the purchasers of mineral lands, to raise a question upon its compact with Michigan, or to disturb its ancient and honored policy."

This case was again before the Supreme Court of the United States, as reported in 20 Howard, 467, the doctrines of the prior case were adhered to, and further illustrated in the separate opinion of Justice DANIEL (text 285-6). Again in the case of *Minnesota Company v. National Co.,* 3 Wallace, 332, the case of *Cooper v. Roberts* was before the court and re-affirmed.   The case of the *Minnesota Company v. National Company* was appealed from the Supreme Court of Michigan, which had therein followed the case of *Cooper v. Roberts,* as reported in 11 Mich. 186.

In the case of *Sprayberry v. State,* and *Burks v. State,* 62 Ala. 459, Chief Justice BRICKELL, in construing the school land grant of Congress to the State of Alabama, says: "The proposed grant of the sixteenth section of every township was subject to the exception of such sections as had been sold, *granted* or disposed of, and then the proposition was that other lands equivalent thereto, and most contiguous to these sections should be granted.   The proposition, therefore, assumes a twofold form.   If the section sixteen had not been sold, *granted* or disposed of, whenever it was surveyed and identified the law intervened, perfecting the title of the State to that section.   No act on the part of the State—none other on the part of the general government,—was necessary to separate it from the public domain. The grant by the general government which the State accepted severs it, and the survey under the authority of

the former identifies and distinguishes it." He cites *Cooper v. Roberts, supra.*

Secretary of the Interior Lamar, construing the Alabama school land grant in a long and able decision reported in 6 Land Dec. 493, discriminates between grants like that of Alabama, and that of California; shows they were to be differently construed; that the Alabama grant was in the nature of a compact; that it was enacted before the policy of the government with regard to the mineral lands of the west came into existence, and that no construction is to be put upon the subsequent legislation of Congress which puts the government in the attitude of repudiating, or in any manner limiting the provisions of that compact. And he denied the contention that subsequent legislation of Congress making disposition of all mineral lands could be applied to a sixteenth section having minerals on it.

In the case of *Leavenworth, Lawrence and Galveston R. R. Co. v. United States,* 92 U. S. 733, the Supreme Court of the United States in construing a land grant to Kansas to aid in the construction of railroads, says: "It creates an immediate interest and does not indicate a purpose to give in the future." "There be and is hereby granted" are words of absolute donation and import a *grant in presenti.* * * * They vest a present title in the State of Kansas, though a survey of the lands and a location of the road are necessary to give precision to it, and attach it to any particular tract" (text 741). Looking at the language of the act of 1845 alone some uncertainty might arise from the use of the words "or other lands equivalent thereto," because they are not qualified by the expression "and when such sections have been sold or otherwise disposed of," or other similar language as in school grants to other States, and for this reason it might be possible to construe the act as granting or promising to grant the sixteenth sections or other lands equivalent thereto at the option of the United States. There is no doubt that the general policy

VOL. 47, JANUARY TERM, 1904.        323

State *ex rel.* Kittel v. Trustees I. I. Fund.—Opinion of Court.

of the Government was to grant the sixteenth sections specifically for school purposes, and that the provisions for equivalent lands usually inserted in such grants were intended merely to indemnify for the loss of sixteenth sections which had already· been disposed of or appropriated to other purposes.   This policy with respect to Florida is manifest from the act of Congress approved June 15th, 1844, which provides that wherever the sixteenth sections in Florida "either in whole or in part are now or may hereafter be included in private claims,  *   *   *   other lands equivalent thereto   *   *   *   may be selected in lieu thereof  *   *   *   *   ." In view of this well known policy, and of the language of the act quoted which was in force at the time the act of 1845 was passed, we construe the words "or other lands equivalent thereto" not as reserving an option to grant other lands for any and all sections sixteen, but as granting to the State other lands in lieu of any section sixteen or part thereof that had been previously appropriated to other purposes or disposed of by the United States.   This construction coincides with that adopted by the legislature and by the State officials invested with the management of the school lands and in accord with the general policy of Congress in making grants for school purposes.   It is also the construction which Congress evidently intended, otherwise the act itself or subsequent legislation would have provided a method for the exercise of the option, if any was intended to be, reserved by the language quoted.

Without further burdening this opinion with citations or quotations, we are of opinion that the act of Congress of March 3, 1845, granting school lands to Florida, was in the nature of a compact between the State and the United States Government, and was a special grant *in presenti* of every sixteenth section in every township which previous to survey had not been disposed of under legal authority from the Government of the United States, and that when by survey a sixteenth section, or fractional part thereof, is

ascertained to exist in any township, the grant immediately attaches thereto without a patent, by relation back to the date of the said act of Congress.

2nd. The answer alleges that the north and west boundary lines of fractional township 8 s., r. 8 w., and the traverse of the Apalachicola river on the east, and of Lake Wimico on the south of said township, were surveyed in 1852 by H. Wells, Deputy Surveyor, and the survey was approved September 16, 1853, by John Westcott, Surveyor-General of Florida; that the boundary lines of the sections and lots in said township were extended in 1884, and the boundaries of fractional section sixteen in said township were definitely located, and said fractional section sixteen was divided into lots which were numbered 1, 2, 3, 4, 5, and the acreage in each lot was ascertained by the Surveyor-General of Florida, and a record thereof was made in 1884, in the Surveyor-General's office. A certified copy of diagrams kept in the office of the Surveyor-General of Florida showing the above facts are filed in this case as a part of the answer. We are of opinion that the foregoing survey and the above described act of the Surveyor-General in extending the boundary lines of the sections and lots of the said township in 1884, and showing the existence of fractional section 16 therein, and its acreage, was a sufficient survey to cause the grant of 1845 to immediately attach to said fractional section sixteen. After such a survey showing the existence of the fractional sec. we do not understand how there could be any practical insurmountable difficulty in having the corners located by a competent surveyor, applying the rules and principles of the system of rectangular surveying used in surveying the public lands in Florida by the United States Government since 1824. If we are correct in this view, the title in and to said fractional section 16 had already vested in the State of Florida for school purposes, on March 16th, 1889, when certificate No. 13,909 was issued by the Board of Internal Improvement.

## VOL. 47, JANUARY TERM, 1904.     325

State *ex rel.* Kittel **v.** Trustees I. I. Fund.—Opinion of Court.

·3rd. The act of September 28th, 1850, entitled "An act to enable the State of Arknasas and other States to reclaim the swamp lands within their limits," is a general act, granting *in presenti* to the States the swamp and overflowed lands, which at the date of this act were unsold. Recurring to and governed by the views of Secretary Lamar, 6 L. Dec. 493, hereinbefore quoted, and to those of the Supreme Court of the United States in *Cooper v. Roberts, supra,* and *Minnesota Company v. National Company, supra,* we do not think the swamp land grant of September 28, 1850, nor the confirmatory act of Congress of March 3, 1857, should be so construed as to put the Government of the United States in the attitude of repudiating or in any wise limiting the provisions of the school land grant of March 3, 1845, which we regard as a compact made for valuable consideration. We, therefore, do not think that the swamp land grant of 1850 was intended to convey to the State of Florida any sixteenth section in the State or fraction thereof.

We are, therefore, of opinion that irrespective of any question of survey thereof the selection and listing of the fractional section 16 in controversy as swamp and overflowed land and the patenting thereof to the State as such land were void and of no effect. *Beecher v. Wetherby,* 95 U. S. 517; *Florida Town Imp. Co. v. Bigalsky,* 44 Fla. 771, 33 South. Rep. 450, and authorities cited therein.

In support of our views we further cite *Leavenworth, Lawrence and Galveston R. R. Co. v. United States,* 92 U. S. 733, text 741-2; *St. Paul & S. C. R. Co. v. Winona & St. P. R. Co.,* 112 U. S. 720, 5 Sup. Ct. Rep. 334; *Wilcox v. Jackson,* 13 Peters, 498, to the effect that when land has been previously appropriated to another purpose a subsequent grant by Congress can not be supposed to include such land, unless there be an express declaration to that effect.

In the case at bar the pleadings show that there has been such a survey of fractional township 8 s., r. 8 w., as

to make it plain that said township contains a fractional section 16, with the lots into which it has been divided, and the number of acres of each lot, and it follows from the conclusion reached above that *eo instanti* upon the ascertainment of its existence by the survey in 1853, and official plat in 1884, said section 16 passed to the State of Florida as school land under the grant of March 3, 1845, as of the date of the grant; that it was not included in the grant of 1850 of swamp and overflowed lands, and that under the constitution of 1885, sec. 3, Art. XII and laws made in pursuance thereof, it passed under the exclusive control and disposition of the State Board of Education, an entirely different official body from that of the trustees of the Internal Improvement Fund; and that the latter body, even if they had the power generally to issue certificates for *swamp* and *overflowed* lands, such as was issued to the relator's assignor in this case, that yet such trustees of the Internal Improvement Fund had no right, authority or power to issue a certificate to any section 16, because they had no authority or power over such section, it being exclusively under the control and disposition of the State Board of Education *as school land,* and that, therefore, such certificate if it intended or purported to include the said fractional section was as to such section a nullity and gave no such right or interest therein as could be enforced by mandamus.

In view of the facts and the law, we are of the opinion that the demurrer to the answer should be overruled. It is, therefore, considered and ordered that the demurrer to the amended answer of respondents be and the same is hereby overruled.

TAYLOR, C. J., and SHACKLEFORD, J., concur.

CARTER, P. J., and MAXWELL and COCKRELL, JJ., concur in the opinion.