THE STATE OF FLORIDA, *ex rel.* R. HUDSON BURR, A. S.
WELLS AND E. S. MATTHEWS, AS RAILROAD COMMISSION-
ERS OF THE STATE OF FLORIDA, *Relators*, v. SEABOARD AIR
LINE RAILROAD COMPANY, *Respondent*.

1. A return to a sufficient alternative writ of mandamus must
   state all the facts relied upon by the respondent with such
   precision and certainty that the court may be fully advised
   of all the particulars necessary to enable it to pass upon the
   sufficiency of the return; and its statements cannot be sup-
   plemented by inference or intendment.

2. Great strictness of pleading is required in returns which set
   up matter of confession and avoidance.

3. A general denial in an answer in mandamus may be quali-
   fied or explained by the positive averments of the answer.

4. In mandamus proceedings, by moving for a peremptory writ
   on the pleadings, the relators admit the truth of the well
   pleaded averments of facts that are contained in the answer

or return, but do not admit asserted conclusions that are not sustained by facts stated in the answer or return.

5. Where the allegations of an alternative writ of mandamus show that the shipments to which an intrastate rate is commanded to be applied, are intrastate shipments, and the answer to the alternative writ avers conclusions that the shipments are interstate shipments, but does not state facts that clearly show the shipments to be in fact and in law interstate and not intrastate shipments, such answer is not a good defense to the issuance of a peremptory writ.

A case of original jurisdiction.

*James E. Calkins, Fred H. Davis* and *George C. Bedell,* for Relators.

*W. E. Kay, W. J. Oven, James F. Wright* and *F. W. Gwathmey,* for Respondents.

ELLIS, J.—These two cases were by agreement argued together. They involve the same questions and grew out of the refusal of the respective railroad companies to put into effect certain freight rates and charges prescribed by the Railroad Commissioners for the intrastate transportation of "petroleum and petroleum products" from Jacksonville and Tampa, Florida, to points or stations upon the respective lines of the respondents in the State of Florida.

The allegations of the alternative writs relating to the intra transportation of "petroleum and petroleum products" are in substance: that large quantities of petroleum and petroleum products are transported by water from Mexico, Texas and Louisiana in tank steamers owned and operated by oil companies and taken into the ports of Jacksonville and Tampa and there unloaded into permanent storage tanks and warehouses owned and main-

tained by the oil companies and "situated upon the rails of said" railroads. There such products are held for sale and distribution by the oil companies; and that when such products are loaded in vessels at Mexico, Texas and Louisiana ports the only known destination of such products is either Jacksonville or Tampa until after placement in the tanks or warehouses.

That small quantities of high grade "petroleum products" in barrels, cases and boxes are transported by rail from Rochester, New York; Louisville, Kentucky; Bayonne, New Jersey, and other out of state shipping points, to the ports of Jacksonville and Tampa and "unloaded into warehouses situated on 'he rails of the said railroad" companies where the products are held for sale and distribution by the oil companies. That when such products leave the points of origin of shipment the only known destinations are the warehouses at Tampa or Jacksonville.

That a portion of such "petroleum and petroleum products," so placed in the storage tanks and warehouses at Tampa and Jacksonville, is billed and shipped by the oil companies, as orders are received for the same, by rail in carload lots over the lines of the railroad companies wholly within the state to the agents of the oil companies at various "bulk distributing and consuming stations" located on the lines of the said railroad companies. That such shipments are intrastate traffic and the rates prescribed by the relators are applicable.

That a portion of such products stored in tanks and warehouses, as alleged, is billed and shipped by the oil companies, as orders are received from consumers, in carload and less than carload lots to points wholly within the State. That such shipments constitute intrastate traffic and the rates prescribed by the relators are applicable.

That a portion of such products is shipped by rail and

3—Vol. 92.

water to interstate points and that a portion is sold locally to the trade near Jacksonville and Tampa.

It is also alleged that prior to June 15, 1923, the respondents observed the rates prescribed by the relators for the transportation of such products from Jacksonville and Tampa to points in Florida but that since that date the railroad companies have disregarded and failed to observe such rates.

The respondents answered admitting that they owned and operated as part of their systems lines of railroad extending from Jacksonville and from Tampa to various stations within the State of Florida and they were engaged in carrying, as a public employment, freight for compensation over their lines of road in the State and that the freight rates and charges applicable to intrastate traffic are subject to regulation by the Railroad Commission of Florida, which had prescribed just and reasonable freight rates and charges, carload and less than carload, for the intrastate transportation of petroleum and petroleum products over their lines of road.

They denied that the petroleum and petroleum products which are shipped from points outside the state to Tampa and Jacksonville are unloaded into permanent storage tanks and warehouses and there held for sale and distribution and that the only known destination of such products at the time of shipment is either Jacksonville or Tampa and no other destination is determined until after placement of the products in the tanks and warehouses. They aver that the oil companies ship their products from their refineries, which are located at points outside the state, in their own tank steamers and barges to Jacksonville and Tampa where they have large tanks into which the products are pumped from the steamers and barges through direct pipe lines and sometimes directly into tank cars. That a

small percentage of such products is consumed locally at Jacksonville and Tampa where it is distributed by trucks to consumers in the cities and adjacent territory. A small proportion is shipped in drums and barrels to points in Florida and in other states. That a greater portion of such products is carried from Tampa and Jacksonville in tank cars, owned or controlled by the oil companies, to various destinations in Florida as part of a continuous or through movement from the point of origin of shipment outside the state. That at such destinations some of the products are transferred from the tank cars to storage tanks owned by the oil companies' and thence distributed. That a large portion of it consists of fuel oil and moves directly to phosphate mines and in many cases the products remain the property of the oil companies during the entire course of transportation from the points of origin of the shipment to the interior Florida points. The movement from Jacksonville and Tampa being only an incident of the through transportation.

It was averred that the tanks at Jacksonville and Tampa are provided by oil companies for the purpose of enabling them to complete the through transportation of the traffic, including its transshipment from vessels to the cars, and constitute in substance and effect nothing more than facilities which railroads provide in connection with other traffic moving through the ports. That through the entire course of transportation from the points of origin outside the State to the destinations of the products in the State the traffic constitutes in its essential character interstate commerce.

It was also averred that prior to the movement of the products in tank steamers to the ports of Jacksonville and Tampa the oil companies have knowledge of the fact that the great majority of the products is not intended to come

to rest at those ports and that the ultimate destinations of the shipment are intended to be interior points beyond such ports in the State of Florida.

That the oil companies have contracts with customers located at interior points within Florida to supply them with petroleum products as their needs arise and that the greater portion of petroleum and petroleum products shipped from Jacksonville and Tampa to customers at interior points within the State is shipped to fulfill such contracts. That it is the intention of the oil companies when petroleum and petroleum products are shipped from points out of the State to Jacksonville and Tampa that the transit shall not end at those ports, but that the petroleum and products shall be used to supply customers at interior points within the State; and that the storage at Jacksonville is an incident in the movement from the refineries to the interior destinations within the State. That shipments are also made from the refineries to Tampa and Jacksonville to supply petroleum and petroleum products to customers with whom no contracts have been made.

It is averred that it is the intention of the oil companies in shipping petroleum and petroleum products to the ports of Tampa and Jacksonville to supply all their Florida customers from those ports, it "never being intended" that there should be any stoppage at those ports except as incidental to the further movements of the products to the interior points and in order to equalize the incoming shipments with the irregular requirements of the oil companies' customers.

It was averred that a large portion of the "traffic" consists of fuel oil moving to phosphate mines and that respondents apply the interstate transportation rates to such shipments pursuant to a decision of the Interstate Commerce Commission, handed down in March, 1921, and reported in 60 I. C. C. 726. That they applied the same

VOL. 92, JUNE TERM, 1926.                    69

State of Fla. ex rel. Burr et al. v. S. A. L. R. Co.—Opinion of Court.

rates to other shipments because not to do so would be a discrimination against them.

The answer of the Seaboard Air Line Railway, against whom the mandamus proceedings were commenced by the Railroad Commissioners before proceedings were begun against the Atlantic Coast Line Railroad, contained an averment to the effect that the latter road applied the interstate rate to such shipments but that relators had not proceeded against that road, which amounted to a discrimination against the Seaboard Air Line Railway. Proceedings were then begun against the Atlantic Coast Line Railroad and, as stated, the two cases were argued and considered together.

On January 18, 1926, the relators, by their counsel, moved to strike certain matter from the return of the respondents and for a peremptory writ. The motion was submitted on brief and oral argument in April.

The motion to strike was directed to that portion of the answers in which it was averred that the respondents applied the interstate transportation rates, to that portion of the "traffic" consisting of fuel oil moving to phosphate mines, pursuant to a decision of the Interstate Commerce Commission and other averments of like character contained in the last clauses of the answers.

The ground set up as the basis for the motion for a peremptory writ are: That the answers of the respondents admit the material allegations of the writ and those matters set up in avoidance constitute no defense; that on the face of the pleadings the relators should have the writ; and that the returns set up no facts constituting any legal excuse for the failure to perform the things required to be performed by the writ.

The averments which the relators seek by the motion to have stricken from the answers constitute no defense to the writ though they present a cogent reason for the belief of

the respondents that their disregard of the intrastate rate was well founded. For if the decision of the Interstate Commerce Commission and that of the Supreme Court of the United States, referred to in the objectionable paragraphs, rested upon facts analogous to those averred in the answers to exist they were highly persuasive of the correctness of the respondents' action, but do not of themselves constitute a defense.

The reasonableness of the rates prescribed by the relators is not in question; it is merely a question of the application of those rates to the particular traffic described in the writ and returns. The determination of that question depends upon the nature of that traffic in whole or in.part, whether it is interstate or intrastate.

If the Supreme Court of the United States has ever decided that the exact state of facts as presented by this record constitutes interstate commerce the facts would constitute the defense.

The matters referred to in the paragraphs to which relators interposed objections were wholly irrelevant and should therefore be stricken. See State ex rel. Railroad Com'rs v. Florida East Coast R. Co., 65 Fla. 424, 62 South. Rep. 591; State ex rel. v. Atlantic Coast Line R. Co., 77 Fla. 366, 81 South. Rep. 498.

The sufficiency of the returns to the alternative writs is.challenged by the motion for a peremptory writ. See State ex rel. Railroad Com'rs v. Atlantic Coast Line R. Co., 61 Fla. 799, 54 South. Rep. 900; State ex rel. Knott v. Haskell, 72 Fla. 244, 72 South. Rep. 651.

Where the defense consists of matters in confession and avoidance the return must aver in detail every fact necessary to establish the avoidance. See State ex rel. Patton v. Bloxham, 33 Fla. 482, 15 South. Rep. 227; State ex rel. Kittel v. Jennings, 47 Fla. 307-316, 35 South. Rep. 986.

The command of the alternative writs affects all petro-

leum and petroleum products received by the oil companies in large or small quantities which are unloaded in permanent storage tanks or warehouses in Jacksonville or Tampa and which are held for sale and distribution by the oil companies there and where the only known destination of such products at the time of loading in vessels or cars at the point of origin of such shipments is Jacksonville or Tampa, which the oil companies ship from such ports to their agents at various distributing and consuming stations in Florida, or which they bill and ship as orders are received from consumers direct to such consumers at various consuming points in Florida, where the entire rail transportation is within the state, and wholly over the lines of railroad of the respondents respectively.

The oils are received in Jacksonville and Tampa on interstate movement. Whether subsequent movements from those points under the circumstances averred in the answers are movements in intrastate or interstate commerce must be determined by the essential character of the commerce and not by billing or forms of contract. See Chicago M. & St. P. R. Co. v. Iowa, 233 U. S. 334, 34 Sup. Ct. Rep. 592, 58 L. Ed. 988.

The character of the commerce, as described by the answers, which must be taken as admitted, upon the motion for a peremptory writ, possesses the following features:

First: The oil companies ship their products from their refineries located out of the state to Jacksonville and Tampa where they are transferred to tanks and warehouses owned by the oil companies and from those points reshipped to points within the state.

Second: The reshipment to such points is pursuant to the terms of contracts previously made for supplying independent dealers at such points or pursuant to the prear-

rangement of the oil companies for supplying their own stations at such points.

Third: The destinations of the products intended for independent dealers on contracts with them or for the stations of the oil companies at interior points are known and determined before the products leave the point of original shipment.

Fourth: The quantity of petroleum and petroleum products to be shipped to each, the independent dealers and the oil companies' own local stations, over a given period of time is determined by the terms of the contracts made by the oil companies, before shipment from points of origin, for supplying customers and their own prearrangements for supplying their stations.

Fifth: The nature of the products is such that, except in the case of refined oils for lubrication which may be contained in separate packages, they must, for convenience and economy in handling, be shipped in bulk to be transshipped to storage tanks at the ports of entry.

Sixth: That the refined oils contained in separate packages are for the same economic reason transshipped to warehouses at such ports.

Seventh: That such tanks and warehouses are merely links or conveniences necessary to facilitate movement of the products from the point of origin of shipment to ultimate destination.

Eighth: That at such ports where the tanks and warehouses of the oil companies are located the products are rebilled to independent dealers or to the oil companies at their own stations.

Ninth: That a great portion of the products is pumped from the tank ships to tank cars owned or controlled by the oil companies to be carried in such cars to the ultimate destinations of such products.

Tenth: That as to a greater part of such products the oil companies do not intend that they shall come to rest at the ports of Jacksonville and Tampa but shall be forwarded in a continuous movement to their ultimate destination.

Eleventh: That as to most of the products arriving in tank steamers and by trains from points out of the state the property remains that of the oil companies during the entire course of transportation from the points of origin of shipment to the interior Florida points.

Twelfth: That the length of time during which the products remain in the warehouses and tanks at the ports named, except in those instances where the oils or products are pumped directly from the tank ships to tank cars to be carried to interior points, is indefinite within certain periods and depends upon the necessities or needs of the independent dealers or that of the companies' local stations.

The commands of the alternative writs do not affect so much of the petroleum and petroleum products as are pumped from the tank ships to tank cars to be carried in such cars to the ultimate destination of such products; so that we are not concerned with such movements as are described in the paragraph numbered nine above.

The State, through the Railroad Commissioners, seeks to enforce the intrastate rate for the transportation of the petroleum and petroleum products which are placed in storage tanks and warehouses at Jacksonville and Tampa and afterwards distributed by the oil companies to their local stations and to customers at different points within the State.

The question in this case does not present the situation where goods are in transportation through a state but are detained for a time by unavoidable causes of delay; nor where goods or commodities which are intended for export or shipment to other states are assembled at a point to be

prepared for such shipment.   Nor is the principle which
was applied in the case of Baltimore & O. S. W. R. Co. v.
Settle, 260 U. S. 166 43 Sup. Ct. Rep. 28, 67 L. Ed. 189,
applicable because the movement of the lumber in that case
from a point outside the State of Ohio to Madisonville in
that State was rebilled at Oakley in the belief that by so
doing a lower rate could be obtained for transportation
from Oakley than the through interstate rate to Madison-
ville.   That the interstate movement might end at Oakley
was never more than a possibility and the intention as it
was carried out determined as a matter of law, the court
said, the essential nature of the movement.

In the case at bar the character of the commodity, that
is to say its essential nature, which is the subject of com-
mercial activities here, precludes the application of the doc-
trine, as applied in some cases, that where goods come to
rest at a point in the state to which they are shipped for
distribution to other points in the state and the identity of
the goods is lost by commingling it with other property of
the shipper the interstate transportation is terminated, be-
cause crude oils and gasoline for economy and convenience
in handling must be shipped from the refineries and wells
of the oil companies in bulk, to be afterwards separated at
the point of distribution and forwarded to the respective
customers and local stations of the companies for whom it
was intended when shipped from the refineries.

Where crude oils are pumped from tank steamers into
tank cars on the railroad tracks and thence carried to the
phosphate mines or to other industries, to which it was
originally intended to be taken, it cannot be accurately
said that the last leg of the journey is an intrastate move-
ment merely because of the temporary delay in transship-
ping the oil or of the different methods of transportation
nor because some business agent of the companies must be

present supervising the trans-shipment and rebilling of the commodity.

The mere existence of business agencies of the oil companies at the ports of entry is not the determining factor which converts the movement which began in interstate commerce into an intrastate movement any more than the transshipment of goods at a seaport for export or shipment to another state would convert the first leg of the journey into an intrastate movement. See Railroad Commission of Louisiana v. Texas & P. R. Co., 229 U. S. 336, 33 Sup. Ct. Rep. 837, 57 L. Ed. 1215; Southern Pac. Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 Sup. Ct. Rep. 279, 55 L. Ed. 310; Railroad Commission of Ohio v. Worthington, 225 U. S. 101, 32 Sup. Ct. Rep. 653, 56 L. Ed. 1004; Texas & N. O. R. Co. v. Sabine Tram. Co., 227 U. S. 111, 33 Sup. Ct. Rep. 229, 57 L. Ed. 442.

Mr. Chief Justice Taft, speaking for the court in Champlain Realty Co. v. Town of Brattleboro, 260 U. S. 366, 43 Sup. Ct. Rep. 146, 67, L. Ed. 309, referring to the interruptions of commodities moving in interstate commerce, said: "If the interruptions are only to promote the safe or convenient transit, then the continuity of the interstate trip is not broken." In that case the court held that pulp wood gathered at places in Vermont and placed in the river to be floated into Connecticut thence to its destination at the mill in Hinsdale, New Hampshire, and which was delayed at Brattleboro, Vermont, at a boom in the West River, until the water in the Connecticut River had receded sufficiently to permit of the logs being held in the boom at Hinsdale, was in interstate movement while delayed at Brattleboro. Mr. Taft said: "The doubt arises when there are interruptions in the journey, and when the property, in its transportation, is under the complete control of the owner during the passage." The "continuity of transit is to be de-

termined by a consideration of the various factors of the situation. Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption.''

Such are the elements or properties by which the essential character of the commerce must be determined.

The cases at bar as presented by the answers of respondents, present a situation which is nearly analagous to the case of Bacon v. People of State of Illinois, 227 U. S. 504, 33 Sup. Ct. Rep. 299, 57 L. Ed. 615. In that case Bacon had bought shipments of grain in transit from western states to New York in the contract for which the carriers had given the shipper the right to remove it ''for the mere temporary purposes of inspecting, weighing, cleaning, clipping, drying, sacking, grading, or mixing, or changing the ownership, consignee, or destination.'' On arrival of the grain in Chicago, Bacon removed the grain from the cars to his private elevator. This removal was for the purpose of inspecting, weighing, grading, mixing, etc., but not to change its ownership, consignee or destination. It was held that whatever his intention the grain was at rest within his complete power of disposition and held for his own benefit and was taxable.

The case of General Oil Co. v. Crain, 209 U. S. 211, 28 Sup. Ct. Rep. 475, 52 L. Ed. 754, is also similar. But both of these cases involved the power of the State in which the commodity was temporarily detained to impose a non-discriminatory tax upon them and that power was upheld, but denied in the Champlain Realty Co. v. Brattleboro case, *supra*.

The principle is recognized in that case that if the com-

modity is in actual interstate movement power does not exist in the State through which it is passing to tax it.

The cause and purpose of the delay at Jacksonville and Tampa of the petroleum and petroleum products of the oil companies is the determining factor by which it may be determined whether the reshipment of the products at those points from storage tanks and warehouses is or is not a continuation of the original interstate movement.

The answers do not present a distinct question of fact upon this phase of the matter. From anything averred to the contrary the oil companies retain the ownership of all the products arriving at the ports; that storage there is for their convenience and subsequent disposition of the commodity; that all, or any portion, of it may be resold in fact and diverted from the original destination of it; that it is held there for the profit of the companies by sales of a large portion, or all of it, to customers with whom at the time of the original shipment they have no contract.

It affirmatively appears from the allegations of the writs and the averment of the answers that the actual transportation of the petroleum and petroleum products ceases at Tampa and Jacksonville; that the warehouses and storage tanks are the property of the oil companies; that when placed in storage tanks and warehouses of the oil companies it is withdrawn from the carriers which transported it to Florida; that subsequent movements are the result of new contracts of carriage with the respondents and the time of such subsequent movements is indefinite and dependent upon the convenience and pleasure of the oil companies; that an indeterminate quantity of the products brought in any one shipment to Florida may be disposed of by the companies to persons other than those for whom the particular shipment was originally intended.

In this view of the facts we are of the opinion that the petroleum and petroleum products stored in storage tanks

and warehouses at Jacksonville and Tampa come to rest there; that the interstate movement ceases and that subsequent shipments of it to points within the State are intrastate movements and subject to the rates prescribed by the relators.

The peremptory writ is therefore awarded as prayed.

BROWN, C. J., AND WHITFIELD, TERRELL, STRUM AND BUFORD, J. J., concur.

WHITFIELD, J., concurring:

Each alternative writ alleges facts that in law constitute intrastate and not interstate transportation. See Chicago, M. & St. P. R. Co. v. State of Iowa, 233 U. S. 334, 34 Sup. Ct. Rep. 592; Standard Oil Co. v. Atlantic Coast Line R. Co., 6 Fed. Rep. (2nd Ser.) 911; affirmed C. C. A. April 14, 1926, 12 Fed. (2nd) 541; General Oil Co. v. Crain, 209 U. S. 211, 28 Sup. Ct. Rep. 475; Gulf, C. & S. F. R. Co. v. State of Texas, 204 U. S. 403, 27 Sup. Ct. Rep. 360; Pittsburg & S. Coal Co. v. Bates, 156 U. S. 577, 15 Sup. Ct. Rep. 415; Traffic Department, Goldsboro, N. C. Chamber of Commerce v. Atlantic Coast Line R. Co., 91 I. C. C. Rep. 315.

Each answer admits the formal parts of the alternative writ and states that the other allegations of the writ "are denied except as hereinafter admitted." The answers do not specifically deny the several allegations of the alternative writs and do not contradict or refute such allegations; but the answers in effect admit the allegations of the alternative writs relative to the nature of the shipments in controversy by stating facts that are consistent with such allegations showing the shipments in question to be intrastate and not interstate transportation. The answers aver conclusions that the shipments are interstate transportation,

but such conclusions are not supported by the facts averred in the answers. In moving for peremptory writs on the pleadings, the relators admit the truth of the well pleaded averment of facts that are contained in the answers, but do not admit asserted conclusions that are not sustained by facts stated in the answers. As each alternative writ contains sufficient allegations to support its command that the respondent shall apply intrastate rates to the shipments that are specified in each command, the peremptory writs should be issued unless the answers by positive, definite and adequate averments of fact, clearly show that such shipments are in fact and in law interstate transportation.

A return to a sufficient alternative writ of mandamus must state all facts relied upon by the respondent with such precision and certainty that the court may be fully advised of all the particulars necessary to enable it to pass upon the sufficiency of the return; and its statements cannot be supplemented by inference or intendment. Ray v. Wilson, 29 Fla. 342, 10 South. Rep. 613.

Great strictness of pleading is required in returns which set up matter of confession and avoidance. State ex rel v. Mayor, 22 Fla. 21, text 22.

A general denial in an answer in mandamus may be qualified or explained by the positive averments of the answer. State ex rel. Knott v. Haskell, 72 Fla. 244, 72 South. Rep. 651. Denials must be single. 38 C. J. 887; 18 R. C. L. 345.

The alternative writs allege that the stated products owned by oil companies, are shipped from other states or countries, and are in greater part unloaded into permanent storage tanks or warehouses, owned and maintained by the oil companies at the Florida ports, where such products are held for sale and distribution by the oil companies; that the only known destination of said products at the

time of loading at points of origin and until after place-
ment in such warehouses at the Florida ports, is the said
Florida ports; and that portions of such products so placed
in storage tanks and warehouses at said Florida points, are
thereafter billed and shipped over respondents' lines to
other points within the State as orders are received there-
for from agents of the oil companies and from consumers.
The answers do not specifically deny such allegations, but
aver that the said products are pumped from steamers and
barges through pipe lines direct into said tanks, and that
such products taken from the tanks are transported by the
respondent in tank cars owned or controlled by said oil
companies, to points within the State to agents and cus-
tomers of the oil companies.

Such averment of the answers do not negative the allega-
tions of the alternative writs as to storage, holding for
sale and distribution and as to billing and shipment to
other points as orders are received therefor, which allega-
tions show the essential nature of the shipments from the
storage tanks or warehouses to other points within the State
of Florida to be intrastate and not interstate transporta-
tion, the interstate or foreign transportation having ended
when the products were unloaded into the permanent stor-
age tanks or warehouses, not as a temporary rest or as a
part of or an incident in continuous interstate movement,
but for the owners' purposes of sale, distribution and ship-
ment as they may determine.

The averments that such shipments are through move-
ments from points of origin in other States through the
Florida ports to various destinations in Florida; that the
storage at the Florida ports is an incident in the movements
from the refineries in other States and countries to the
interior destinations within the State of Florida; and that
throughout the entire course of transportation from points

of origin to destinations other than the Florida ports within the State of Florida, the traffic constitutes, in its essential character, interstate commerce; and other such averments, are conclusions not supported by definite averments of specific facts. Ray v. Wilson, 29 Fla. 342, 10 South. Rep. 613; 38 C. H. 887; 18 R. C. L. 351.

The pleadings show that petroleum products belonging to oil companies transported in the oil companies' tank steamers from other States and foreign countries, are transferred to storage tanks or warehouses owned and maintained by the oil companies at ports in the State of Florida, from which storage tanks or warehouses the products, as orders for portions thereof are received, are subsequently, at times and in quantities to meet the demands or orders of the owners' agents or customers, billed and shipped over respondents' rail lines to such agents or customers at other points in Florida. When the products are unloaded from the water transports into the storage tanks or warehouses of the owners at the Florida ports the movement in interstate or foreign commerce terminates. This is so because the pleadings disclose that such transfer from the owners' tank steamers to the owners' storage tanks or warehouses at the Florida ports, is not to conserve the products in interstate shipments and is not a part of or an incident in continuous movements from the ports of origin in other states or countries, through the Florida ports, to the owners' agents or customers at other points in Florida; and the pleadings further show that such transfer of the products from the owners' water transports to the owners' tanks or warehouses is for the purposes of storage and sale or distribution followed by billing and shipping over respondents' rail lines to other Florida points as the owners may determine upon orders to be thereafter received. If at any time before the products are unloaded into the

owners' storage tanks or warehouses at the Florida ports, further shipments be contemplated, such subsequent shipments are not a continuation of the original interstate movement, but an independent movement for distribution as orders are received.

It does not appear that before or during the interstate movement or before being placed in the owners' storage tanks or warehouses at the Florida ports, any definite quantity of the products was intended to go in continuous movement to particular agents or customers of the owners, or to any particular points beyond the ports of entry in Florida.

It appears from the pleadings that the interstate movement ceases when the products are put into the owners' tanks or warehouses at the Florida ports for storage and subsequent sale or distribution and shipment as the owner may determine, upon orders thereafter received from the owners' agents and customers, and that the shipments referred to in the commands of the alternative writs as being from the owners' tanks or warehouses at the Florida ports to the owners' agents or customers at other points within the State of Florida, constitute intrastate and not interstate transportation.   The answer is not sufficient as a defense to the issuance of a peremptory writ.   18 R. C. L. 351; 38 C. J. 899.   See People's Natural Gas Co. v. Public Service Commission of Pennsylvania, U. S. ——, 46 Sup. Ct. Rep. 371.

BROWN, C. J., AND TERRELL AND STRUM, J. J., concur.