THE EVERGLADES SUGAR & LAND COMPANY, A CORPORATION, THE EVERGLADES LAND SALES COMPANY, A CORPORATION, AND THE EVERGLADES LAND COMPANY, A CORPORATION, *Appellants,* v. FRANK A. BRYAN, CLERK OF THE CIRCUIT COURT OF BROWARD COUNTY, FLORIDA, TRUSTEES OF THE INTERNAL FUND OF THE STATE OF FLORIDA, BOARD OF COMMISSIONERS OF EVERGLADES DRAINAGE DISTRICT, SIDNEY J. CATTS, GOVERNOR, VAN C. SWEARINGEN, ATTORNEY GENERAL, J. C. LUNING, TREASURER, ERNEST AMOS, COMPTROLLER, W. A. McRAE, COMMISSIONER OF AGRICULTURE OF THE STATE OF FLORIDA, BEING SAID TRUSTEES AND CONSTITUTING SAID BOARD, *Appellees.*

### Opinion Filed February 2, 1921.

1. The discretion of the Legislature when exercised for the public welfare in selecting the subjects of police regulations and in determining the nature and extent of such regulations is limited only by the requirements of the fundamental law that the regulations shall not invade private rights secured by the Constitution, and shall not be merely arbitrary in applying to some persons and not to others similarly conditioned.

2.  The drainage and reclamation of swamp and overflowed lands are a proper exercise of legislative authority.

3.  There is no express provision in the State Constitution as to special assessments for local improvements or as to the formation of taxing districts for particular purposes.

4.  The five State officers acting as Trustees of the Internal Improvement Fund of the State of Florida are charged with the administration of a State trust fund, consisting of the swamp and overflowed lands and other lands granted to the State by the Congress, the trustees having powers to dispose of the lands and to apply the proceeds thereof or the lands in kind to drainage and other expressed purposes, subject to such limitations and regulations as may be prescribed by law for the execution of the statutory trust. This trust is State wide in extent.

5.  The police power of the State inheres in its sovereignty and is subject only to applicable provisions of the Federal and State Constitutions designed to protect private rights from arbitrary and oppressive governmental action.

6.  Even if purchasers of swamp and overflowed lands have justiciable rights in the administration of the Internal Improvement Fund, because of the purchase of lands from the Trustees of the Fund, such rights can not stay the exercise by the State of its sovereign governmental powers to assess the lands for special purposes that are beneficial to the lands and conserve the general welfare.

7.  The obligation of the State to use the proceeds of the swamp and overflowed lands for drainage purposes is to the United States and not to those who purchase the lands from State agencies.

8.  The Legislature and the State officers having charge of the internal improvement fund necessarily have discretionary powers as to the use of the fund which is State wide in its purposes.

9. In the purchase of swamp and overflowed lands that have not been conveyed, the vendees take them with knowledge or notice that the lands described are to be located by an authorized survey, and with notice that all property in the State is acquired and held subject to the due exercise by the State of its police power. Such purchasers also take with notice that there is no provision of law for paying taxes on State School lands, and that the Constitution provides that 25% of the sales of public lands constitute a part of the inviolable State School Fund.

10. If money is advanced by the Trustees of the I. I. Fund pursuant to their authority, from the general trust fund for use in a district, and the amounts so advanced are credited on the acreage taxes assessed against the lands of the fund in the district, other assessments are not thereby invalidated.

11. Where purchases of unsurveyed lands in large areas are made of given acreage described by sections, townships and ranges, which contemplate 640 acres to the section, and 36 sections to the township, the location of the particular lands intended to be conveyed may be ascertained by an authorized survey; and if the lands so located are not all in fact precisely where the purchasers supposed they would be, no harm is done the purchasers, even though the purchases were made with reference to a plat on which lines were merely protracted on the plat over the space representing the unsurveyed area, since an actual survey was contemplated and a particular acreage was intended to pass by the descriptions used, the land as located by the authorized survey being of the same general character as all other land in the vast unsurveyed area, and there being no discrimination or injustice in making the surveys or otherwise that could in any way adversely affect the purchasers of such lands.

12. The court will not interfere with the administration of the Internal Improvement Fund of the State by the State officials designated by the statute as trustees of such Fund,

when the trustees act within the scope of their statutory authority, unless the Constitution is being violated or private rights are invaded contrary to law and equity.

An Appeal from the Circuit Court for Broward County; E. B. Donnell, Judge.

Decree affirmed.

*Hudson, Wolfe & Cason* and *Clair D. Vallette,* for Appellants;

*Atkinson & Burdine* and *Glenn Terrell,* for Appellees.

## STATEMENT.

The bill of complaint herein as amended alleges in substance that the complainants are owners of swamp and overflowed lands included in the Everglades Drainage District in the southern portion of this State and derived title from persons who purchased from the Trustees of the Internal Improvement Fund of the State of Florida after July 14, 1907, and prior to November 4, 1911; that assessments of benefits (called Drainage Taxes) were levied by the Legislature of the State of Florida upon all the lands included in Everglades Drainage District by Chapter 6456, Acts of 1913, Laws of Florida and Acts amendatory thereto; that lists of said lands in the year 1915 and 1916 were made by the Board of Commissioners of Everglades Drainage District by sections, townships and ranges only and without descriptions or assessments of the lands included within such sections, townships and ranges, and that upon and against each section the amount of the drainage tax assessed upon lands contained in such section was extended and stated; that such

lists were sent to the Tax Assessor of the various counties including any part of the district; that thereafter the Tax Assessor entered in a column of the assessment roll, which column was headed ''Drainage Taxes,'' the amount of the drainage taxes as divided and assessed by him upon the particular tracts located within such section in accordance with Section 9 of Chapter 6456 as amended; and that said section further provides that the tax levied by the Act ''Shall constitute a lien upon the lands so assesed;'' that the description of the lands assessed for Everglades drainage taxes was in each instance the same as that used by the Tax Assessor in describing the lands assessed for State, county, special tax school district and other general or local taxes; that sale of lands were made for nonpayment of the assessment for certain years; that plats were made of the unsurveyed swamp and overflowed lands in that portion of the State where the Everglades Drainage District now is, by projecting the lines from points in surveys on each side and making appropriate numbering by which the conveyances were made; that subsequently upon actual surveys a change was made in some of the lines that had been merely protracted and that this change was attempted to be validated by Chapter 7892, Acts of 1919; that the assessments were made according to the descriptions of surveys as actually made and not according to the descriptions under the protracted lines by which the conveyances of the land were made; and that the assessments are illegal as a consequence. There are many other lengthy allegations that need not be stated here. Desired relief was prayed for. The bill was dismissed on demurrer and complainants appealed.

By treaty of February 22nd, 1819, the Kingdom of Spain ceded "to the United States in full property and sover-

eignty, all the territories    *    *    *    known by the name
of East and West Florida," with an expressed provision
that all the grants of land made by Spain before January
24th, 1818, in said territories shall be ratified and con-
firmed to the persons in possession of the lands.   State
ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353.

Under that Treaty the United States acquired the own-
ership of all lands including the swamp and overflowed
lands in the area now constituting the territorial limits
of the State of Florida that had not previously been
granted by Spain; and the admission of the State of
Florida into the Union by the Act of Congress approved
March 3rd, 1845, did not affect the proprietary rights of
the United States in the lands within the State that have
been ceded to the United States by Spain where such
lands did not constitute the beds or shores of the navi-
gable waters of the State.   Trustees Internal Improve-
ment Fund v. Root, 63 Fla. 666, 58 South. Rep. 371;
Brickell v. Trammell, 77 Fla. 544, 82 South. Rep. 221.

The Constitution formulated at Saint Joseph and pro-
claimed January 11th, 1839, under which the State of
Florida was by Act of Congress, pursuant to Section 3,
Article IV, of the Federal Constitution, admitted into
the Union on March 3, 1845, contains the following pro-
visions:

1.   It shall be the duty of the general assembly to pro-
vide for the prevention of waste and damage of the public
lands now possessed, or that may hereafter be ceded to
the Territory of the State of Florida, and it may pass
laws for the sale of any part or portion thereof, and in
such case provide for the safety, security and appropria-
tion of the proceeds.

2. A liberal system of internal improvements being essential to the development of the resources of the Country, shall be encouraged by the government of the State, and it shall be the duty of the General Assembly, as soon as practicable, to ascertain by law, proper objects of improvement in relation to roads, canals, and navigable streams, and to provide for, a suitable application of such funds as may be appropriated for such improvements. §§1 & 2, Art. XI Const. 1838-9.

Chapter LXXV. An Act Supplemental to the Act for the admission of Florida and Iowa into the Union, and for other purposes.

*Be It Enacted by the Senate and House of Representatives of the United States of America in Congress Assembled,* That in consideration of the concessions made by the State of Florida in respect to the public lands, there be granted to the State eight entire sections of land for the purpose of fixing their seat of 'Government; also, section number sixteen in every township, or other lands equivalent thereto, for the use of the inhabitants of such township, for the support of public schools; also two entire townships of land, in addition to the two townships already reserved, for the use of two seminaries of learning, one to be located east, and the other west of the Suwannee River; also, five per centum of the net proceeds of the sale of lands within said State, which shall be hereafter sold by Congress, after deducting all expenses incident to the same; and which said net proceeds shall be applied by said State for the purposes of education.

Approved March 3, 1845.

Page 788, Vol. 5, United States Statutes at large.

On January 6, 1848, the Florida Legislature adopted
the following:

WHEREAS, large tracts of the public lands lying in
the vicinity of Lake Okee-cho-bee, and in that region
South of said lake called "the everglades," being covered
with water are incapable of being surveyed and sub-
divided, and are therefore valueless to the United States;
AND WHEREAS, it is believed that a large portion of
said lands may be drained by canals, reclaimed, and
made valuable for the cultivation of tropical plants and
fruits; AND WHEREAS, it is believed that these lands
if reclaimed, would not only remunerate this State for
the expense of such reclamations but would yield a con-
siderable surplus above such expense; therefore,

*Resolved by the Senate and House of Representatives
of the State of Florida in General Assembly convened,*
That Congress be requested to grant to this State all of
said lands lying South of Carloo-sa-hatchee river and of
the northern shore of Lake Okee-cho-bee, and between the
Gulf of Mexico and the Atlantic Ocean, on conditions
that the State will drain them and apply the proceeds of
the sale thereof, after defraying the expense of draining,
to purposes of education. (Passed by the Senate, Decem-
ber 30, 1847. Passed the House of Representatives, Jan.
6, 1848. Approved by the Governor, Jan. 6, 1848.)

By an Act of Congress approved September 28, 1850,
entitled "An Act to enable the State of Arkansas and
other States to reclaim the 'swamp land'' within their
limits," it is provided that "to enable the State * * *
to construct the necessary levees and drains to reclaim
the swamp and overflowed lands therein, the whole of
those swamp and overflowed lands, made unfit thereby

for cultivation, which shall remain unsold at the passage of this Act, shall be, and the same are hereby, granted to said State.

Sec. 2. *And be it further enacted,* That it shall be the duty of the Secretary of Interior, as soon as may be practicable after the passage of this Act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the Governor of the State of  *  *  * , and, at the request of said Governor, cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in the said State of  *  *  * , subject to the disposal of the Legislature thereof; Provided, however, That the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied, exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid.

Sec. 3. *And be it further enacted,* That in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is "wet and unfit for cultivation," shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.

Sec. 4. *And be it further enacted,* That the provisions of this Act be extended to, and their benefits be conferred upon, each of the other States of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated.

Approved, September 28, 1850.

Pages 519 & 520, United States Statutes at Large, Vol. 9.

By virtue of this grant, the State has received title by patents from the United States to over twenty million acres of swamp and overflowed lands in the State, including the lands in this suit. The disposition of the lands thus granted to the State of Florida was within the Legislative discretion, the obligation of the sovereign State to be observed the condition that they "shall be applied, exclusively, as far as necessary, for the purpose of reclaiming said lands by means of the levees and drains aforesaid," resting only in the sovereign relations of the two governments. Trustees Internal Improvement Fund v. Root, *supra;* Mills County v. Burlington & M. R. R. Co., 107, U. S. 557, 2 Sup. Ct. Rep. 654; Cook County v. Calumet & C. Canal & Dock Co., 138 U. S. 635; text 655, 22 R. C. L. 335.

A patent from the United States is not necessary to the ownership by the State of the sixteenth sections of land granted to the State for school purposes. The Act of Congress making the grant conveys the title to the State, which attaches to the land when located by survey; and the granting act does not require or contemplate the issuing of patents for such lands. The grant of the sixteenth section for school purposes has no reference to the character of the lands; but it covers any land then owned by the United States within the sixteenth sections according to government surveys. State *ex rel.* Kittle v. Jennings, 47 Fla. 307, 35 South. Rep. 986.

While the grant to the State of the swamp and overflowed lands owned by the United States in the State on September 28, 1850, is a grant *in presenti,* and the title attaches when the land is duly located and the location of it is duly approved, yet the act itself expressly requires the issue of patents for such lands upon application by

the Governor of the State. As the grant of swamp and overflowed lands has reference to the character of the lands rather than to the survey descriptions, the character of the lands as being with the grant, is to be determined, hence the provisions contained in the granting act for making "accurate lists and plats of all such lands" and for the issuing of patents "conveying to said State the fee simple of said land. Chapman & Dewey Lumber Co. v. St. Francis Levee Dist., 232 U. S. 186, 34 Sup. Ct. Rep. 297.

The grant to the State for school purposes of the sixteenth sections of all United States lands in the State, having been made in 1845, and being a grant *in presenti* requiring no patent, if any of such lands are included in patents of swamp and overflowed lands under the Act of September 28, 1850, it does not affect the title of the State to such lands under the Act of 1845. State *ex rel.* Kittle v. Jennings, *supra.*

Chapter 610, Laws of Florida, approved January 6, 1855, as amended, contains the following provisions brought forward in the General Statutes of 1906:

"616. So much of the five hundred thousand acres of land granted to this State for internal improvement purposes, by an Act of Congress passed the third day of March, A. D. 1845, as remains unsold, and the proceeds of the sales of such said lands heretofore sold as now remain on hand and unappropriated, and all proceeds that may hereafter accrue from the sales of said lands; also all the swamp land or lands subject to overflow, granted this State by an Act of Congress approved September 28, A. D. 1850, together with all the proceeds that have accrued or may hereafter accrue to the State from the sale of such lands; are set apart, and declared a

separate and distinct fund, called the Internal Improvement Fund of the State of Florida, and are to be strictly applied according to the provisions of this chapter.

"617. For the purpose of assuring the proper application of said fund for the purposes herein declared, said lands and all the funds arising from the sale thereof, after paying the necessary expense of selection, management and sale, are irrevocably vested in five trustees, to-wit: In the Governor of the State, the Comptroller, the State Treasurer, the Attorney-General and the Commissioner of Agriculture, and their successors in office, to hold the same in trust for the uses and purposes hereinafter provided, with the power to sell and transfer said lands to the purchasers and receive payment for the same, and invest the surplus moneys arising therefrom from time to time in stocks of the United States, stocks of the several States, or the Internal Improvement Bonds issued under the provisions of law, and drawing not less than six per cent. annual interest; also the surplus interest accruing from such investments. Said trustees shall have all the rights, property, powers, claims, remedies, actions, suits and things whatsoever belonging to them or appertaining before and at the time of the enactment hereof, and they shall remain subject to and pay, fulfill, perform and discharge all debts, duties and obligations of their trust existing at the time of the enactment hereof or provided for herein.

"620. The Trustees of the Internal Improvement Fund shall fix the price of the public lands included in the trust, having due regard to their location, value for agricultural purposes or on account of timber or naval stores, and make such arrangements for the drainage of the swamp or overflowed lands as in their judgment may be

most advantageous to the Internal Improvement Fund, and the settlement and cultivation of the lands; and the said trustees shall encourage actual settlement and cultivation of the said lands by allowing pre-emptions under such rules and regulations as they may deem advisable; Provided, That in no case shall pre-emption for more than one section of land be granted to any one settler." §§616, 617, 620, Gen. Stats. 1906, Compiled Laws 1914.

The duties of the Trustees are State wide in their scope.

The Constitution of 1868 contains the following: "The common school fund  *  *  *  shall be derived from the following sources: The proceeds of all lands that have been or may hereafter be granted to the State by the United States for educational purposes;  *  *  *  twenty-five per centum of the sales of public lands which are now or may hereafter be owned by the State." "The principal of the common school fund shall remain sacred and inviolate." §§4 & 6, Art. VIII, Const. 1868.

The Constitution of 1885, which became operative January 1, 1887, and is now in force, contains the following: "The State School Fund  *  *  *  shall be derived from the following sources: The proceeds of all lands that have been or may hereafter be granted to the State by the United States for public school purposes;  *  *  *  Twenty-five per cent. of the sales of public lands which are now or may hereafter be owned by the State." "The principal of the State School Fund shall remain sacred and inviolate." §§4 & 5, Art. XII, Const. 1885. In 1905, the following statute was enacted:

"CHAPTER 5377.

"An Act relating to the Drainage and Reclamation of the Swamp and Overflowed Lands in Florida; to Create a Board of Drainage Commissioners, Prescribing its Powers and Duties, Authorizing the Establishment of Drainage Districts, Establishing a Drainage System, the Building of Canals, Levees, Dikes and Reservoirs for the Purposes of Drainage, Irrigation and Commerce, the Assessments of Lands to be Drained and Benefited, the Collection of Necessary Funds by Assessment of Benefits and Taxation, Providing for the Management and Maintenance Thereof and for the Exercise of the Right of Eminent Domain and for the Sale and Uses of Said Land for the Purposes of Drainage, Reclamation and Improvement Aforesaid.

"*Be It Enacted by the Legislature of the State of Florida*:

"Section 1.   The Governor, the Comptroller, the State Treasurer, the Attorney General and the Commissioner of Agriculture of the State of Florida, and their successors in office, are hereby constituted and designated as a Board of Drainage Commissioners, and are hereby authorized and empowered to establish a system of canals, drains, levees, dikes and reservoirs of such dimensions and depth as in the judgment of said Board of Drainage Commissioners is deemed advisable to drain and reclaim the swamp and overflowed lands within the State of Florida, or such parts or portions thereof as is deemed best by said Board of Drainage Commissioners from time to time, and to provide for the irrigation of the lands reclaimed, and to maintain such canals, drains, levees, dikes and reservoirs in such manner as will be most ad-

vantageous to the territory so drained, the State of Flor·
ida, its inhabitants and the commerce thereof.

"Sec. 2.    That the Board of Drainage Commissioners
are hereby authorized and empowered to establish drain-
age districts and to fix the boundaries thereof in the
State of Florida.    That the Board of Drainage Commis-
sioners be and it is hereby authorized and empowered
to prepare a list or lists of all the alluvial or swamp and
overflowed taxable lands within such drainage district
or districts, and levy thereon an acreage tax not exceed-
ing ten cents per acre per annum to be fixed annually
by said Board of Drainage Commissioners, and the vari-
ous tax assessors of the various counties embraced in part
or in whole within such drainage district or districts shall
receive such list or lists and enter the same upon the tax
rolls of the county or counties in which such lands may
lie and the amount so levied by the Board of Drainage
Commissioners in such manner and form as may be pre-
scribed by the Board of Drainage Commissioners from
time to time, which amount shall be collected by the vari-
ous tax collectors of the counties wherein such levies have
been made as other taxes are collected in accordance with
law, and pay over said amounts collected to the Board of
Drainage Commissioners.

"Sec. 3.    That the Board of Drainage Commissioners
be and it is hereby authorized to exercise the right of
eminent domain in the condemnation of lands for ·the lo-
cation of its canals, drains, levees, dikes and reservoirs
for the purposes aforesaid, and may enter upon, take and
use such land as it may, pending condemnation proceed-
ings deem necessary for such purposes, and in ascer-
taining the compensation to be paid for such land or

right of way, benefits to be derived from such drainage shall be considered by the jury.

"Sec. 4.   That all laws and parts of laws in conflict with this act be, and the same are hereby, repealed.

"Sec. 5.   This act shall take effect upon its approval by the Governor.

Approved May 27, 1905."

Chapter 5709, Acts of 1907, amended Sections 1 & 2 of Chapter 5377, by making the named State officers a Board of Drainage Commissioners for designated drainage districts and describing the lands and levying the tax in the act itself.

In 1913 the Legislature, presumably in pursuance of a determination that an exercise of the sovereign power of the State to drain and reclaim a large area constituting *a part only* of the swamp and overflowed lands in the State, would be in the interest of the general welfare of the State and conserve the general good of the people of the State, enacted Chapter 6456, entitled "AN ACT to Establish the Everglades Drainage District in This State and Define its Boundaries, to Create a Board of Commissioners for Said District, and to Define its Powers, Authorizing the Construction of Canals, Drains, Dikes, Reservoirs and other Works for the Reclamation and Benefit of the Lands Embraced in Said District and to Levy Assessments of Taxes Upon the Lands Embraced in Such Districts and to Provide for the Collection of the Same and the sale of Lands to Enforce the Collection of Such Assessments and to Authorize the Board of Commissioners of Said District to Borrow Money and to Issue Bonds and Dispose of the Same, to Procure Money to Carry Out the Provisions of This Act, to Prevent Injury

to Any Works Constructed Under This Act, and to Provide a Penalty for Violating Such Provisions." This statute levies an acreage tax on lands described therein. §5, Chap. 6456, Acts 1913. By this Act, the Governor, Comptroller, Treasurer, Attorney General and Commissioner of Agriculture of the State were designated the Board of Commissioners of Everglades Drainage District," and their powers and duties were defined in the Act. See also Chapters 6453 and 6454, Acts of 1913, authorizing the Trustees and the Drainage Commissioners to borrow money and also authorizing the Trustees of the Internal Improvement Fund to advance money to the Drainage Commissioners for drainage purposes to be repaid in due course. See also Chap. 6957, Acts 1915, and Chap. 7305, Acts 1917, and Chap. 7862, Acts 1919.

The duties of the Trustees as to drainage operations extend over the entire State, while the operations of the "Board of Commissioners of Everglades Drainage District" are limited to the particular district.

Under the rectangular system of surveying the public lands, which long has been in force, they are divided into townships and sections bounded by north and south and east and west lines. A township consists of thirty-six sections—each approximately one mile square—arranged in six rows and progressively numbered by starting with the northeasterly one and proceeding west through the upper row, then east through the second row and then alternately west and east through the others. U. S. Rev., Stats. §2395. A township has the same number of odd-numbered sections that it has of even-numbered ones and the two are so arranged that they alternate just as do the different colored squares on a checker board. The only lines run in the course of the survey are the township

lines and the exterior section lines and the only monuments erected or placed are those which mark these lines. Every section line is a boundary between two sections, one having an odd and the other an even number. A township cannot be divided until its exterior lines are established, and the lines of the alternate odd-numbered sections cannot be established without at the same time and by the same acts establishing the lines of the even-numbered sections. In short, the system is such that a township is surveyed as a unit. Santa Fe Pacific R. R. Co. v. Lane, 244 U. S. 492, text 494, 495, 37 Sup. Ct. Rep. 714.

The township lines established by a prior government survey on each side of the unsurveyed area of a large district of swamp and overflowed lands known as the Everglades held by the Internal Improvement Fund did not conform to the regulation dimensions; but in particular instances the lines were so run as to include more land than would be embraced in townships of 36 sections of 640 acres each. This was not known when the land lines were projected across the unsurveyed lands as shown upon plats. When conveyances were made according to the projected lines the mutual intent was to give and take title to designated portions of sections and townships to cover 640 acres as to a section, and 36 sections to a township. When the irregularity of the adjacent land lines was discovered, the survey of the theretofore unsurveyed lands was made to conform to government regulations. This survey did not change the designated locations of lands conveyed, but the survey developed and formed into irregular tracts, lands not covered by conveyances. These apparently surplus lands belonged not to purchasers of designated sections of 640 acres each, but remained in the trust fund for future sale by the trustees. Purchasers of

lands in the area over which lines were merely protracted as represented by plats, are in no way injured by the development of an actual survey, since designated quantities of lands were purchased in contemplation of an actual survey according to government regulations. Neither the description nor the locations of the lands conveyed or intended to be conveyed have been changed by the actual survey of the lands as contemplated. See minutes of Trustees of the Internal Improvement Fund of the State of Florida.

Official statistics in the United States Land Offices show that the total land and water surface areas of the State of Florida aggregate 37,546,240 acres, and that the total land surface area of the State of Florida aggregates 35,111,040 acres; swamp and overflowed land in the State of Florida patented to the State by the United States under the Act of Congress of September 28, 1850, to January 1, 1919, 20,413,237.14 acres. Total swamp and overflowed land not disposed of by legislative authority and held by the Trustees of the Internal Improvement Fund under Chapter 610, Acts of 1855, as of January 1, 1919, 1,206,870.54 acres.

The "Everglades Drainage District" embraces an area of 4,270,111 acres, including the Everglades, which were patented to the State by the United States in patent No. 137 on April 29, 1903, as unsurveyed swamp and overflowed land and in which are the lands involved in this suit. The boundaries of the Everglades as described in the patent the exterior lines having reference to the government surveys adjoining the unsurveyed lands conveyed, and to bodies of water, certain designated areas being excepted from the body of the lands covered by the patent, the estimated aggregate area conveyed to the State by

patent No. 137, being 2,862,080 acres of unsurveyed swamp and overflowed lands.

The vast area of swamp and overflowed lands in the extreme southern portion of the State of Florida known as "The Everglades," not having been surveyed by the United States as contemplated by the granting Act of Congress of September 28, 1850, were formerly conveyed to the State of Florida as unsurveyed swamp and overflowed lands upon an application made by Governor W. S. Jennings in 1903, the patent of conveyance omitting the particular descriptions which are by "metes and bounds" having reference to adjacent government surveys and to boundary waters of Lake Okeechobee on the north and the Gulf of Mexico on the south, being as follows:
"No. 137.

"The United States of America,

"To All to whom these presents shall come, Greeting:

"Whereas, By the act of Congress approved September 28, 1850, entitled 'An act to enable the State of Arkansas and other States to reclaim the 'Swamp Lands' within their limits,' it is provided that all the 'Swamp and overflowed Lands,' made unfit thereby for cultivation, within the State of Florida, which remained unsold at the passage of said act, shall be granted to said State:

"And, whereas, in pursuance of instruction from the General Land Office of the United States, the several tracts or parcels of land hereinafter described have been selected as 'Swamp and overflowed Lands,' inuring to the said State under the Act aforesaid, situate in the District of Lands subject to sale at Gainesville, Florida, to-wit:

"The Everglades, being the swamp and overflowed lands within the following metes and bounds: commencing at

the southwest corner of T. 60 S,, R. 37 E. \* \* \* (the particular description is omitted herefrom); there are eliminated and excepted from the above (patent) all islands in the Gulf of Mexico adjacent to the mainland; all of what would be the school sections if the lands were surveyed; and the following descriptions, viz.: the S. E. ¼ of S. W. ¼ Sec. 23, and the N. W. ¼ of N. E. ¼ Sec. 25 T. 50 S., R. 40 E.; the N. E. ¼ of S. W. ¼ Sec. 20 T. 50 S., R. 41 E.; the W ½ of N. E. ¼, E. ½ of N. W. ¼, S. W. ¼ of N. W. ¼, N. W. ¼ of S. E. ¼ and N. ½ of S. W. ¼ Sec. 1, and the E. ½ of S. E. ¼, Sec. 2 T. 51 S., R. 41 E., as surveyed by special Agent J. O. Fries in 1898, and as designated on a special plat approved November 16, 1899, accepted April 25, 1900, containing in the aggregate an estimated area of two million eight hundred and sixty-two thousand two hundred and eighty (2,862,280) acres and for which the Governor of the said State of Florida did on the sixth day of April nineteen hundred and three, request a patent to be issued to the said State as required in the aforesaid act.

"Now, therefore, know ye, that the United States of America, in consideration of the premises, and in conformity with the Act of Congress aforesaid, have given and granted, and by these presents do give, and grant unto the said State of Florida, in fee simple subject to the disposal of the Legislature thereof the tracts of land above described. To have and to hold the same, together with all the rights, privileges, immunities and appurtenances thereto belonging, unto the said State of Florida, in fee simple and to its assigns forever.

"In testimony whereof, I, Theodore Roosevelt, President of the United States of America, have caused these letters to be made Patent and the Seal of the General Land Office to be hereunto affixed.

"Given under my hand at the City of Washington, the twenty-ninth day of April, in the year of Our Lord nineteen hundred and three and of the Independence of the United States the one hundred and twenty-seventh.

"SEAL)                By the President: T. Roosevelt,

"By F. M. McKean, Secretary.

"C. H. Brush, Recorder of the General Land Office.

"Recorded V. 3, pp. 333-336 inc:"

The essential proceedings with reference to the plat used in making sales of unsurveyed land by the Trustees of the Internal Improvement Fund are in substance as follows:

"Tallahassee, Fla., Jan. 2, 1905.

"Hon. W. S. Jennings,

"Chairman Trustees Internal Improvement Fund,
    "Tallahassee, Florida.

"Sir:

"In compliance with your request, I here hand you a map, which has been prepared in the Land Office, showing the 'area of the Everglades patent, known as No. 137.

"We extend the lines by rule from the surveyed lines on the east and west side of the Everglades, which is as near a location of the sections, townships and ranges as we can furnish without an actual survey of the same.

"I trust the same will be satisfactory.

"Yours very truly,

"B. E. McLIN,

"Commissioner of Agriculture.

"With reference to the plat submitted, the Trustees adopted the following resolutions, page 6, Vol. 6, Minutes Trustees of Internal Improvement Fund:

"RESOLVED: That the letter of Hon. B. E. McLin, Commissioner of Agriculture, be spread on the minutes of the Trustees, and that the map of the Everglades, as prepared under his direction, be, and the same is hereby, adopted as the official map of the Everglades land, embracing the lands in U. S. Patent No. 137, containing 2,862,280 acres, and that said map be identified by the Secretary endorsing thereon the following words and figures, viz:

"Official map of the Everglades, covering the lands embraced in U. S. Patent No. 137, prepared under direction of Hon. B. E. McLin, Commissioner of Agriculture, and adopted as official by the Trustees of the Internal Improvement Fund of the State of Florida, January 2nd, 1905.

"BE IT FURTHER RESOLVED, That the map be entered on record on a separate page of the minute book of the Trustees of the Internal Improvement Fund of the State of Florida, and a copy of said map, duly certified as aforesaid, be filed in the office of the Hon. B. E. McLin, Commissioner of Agriculture.

"Subsequently an amended map was adopted as is evidenced by the following, from the minutes of the Trustees, June 10th and 14th, 1907.

"Tallahassee, Fla., June 10, 1907, 3 P. M.
\*    \*    \*    \*    \*    \*
"Hon. B. E. McLin, Commissioner of Agriculture, having prepared an amended map of the lands embraced in the United States Patent No. 137, in accordance with the request of the Trustees, and the same having been presented, examined and approved, it was

"RESOLVED, That the amended official map of the Everglades, covering the lands embraced in the United States Patent No. 137, prepared under the direction of Hon. B. E. McLin, Commissioner of Agriculture, be, and the same is hereby, adopted as official by the Trustees of the Internal Improvement Fund of the State of Florida on this the 10th day of June, A. D. 1907. and

"RESOLVED, FURTHER, That the amended map be entered of record on a separate page of the minute book of the Trustees of the Internal Improvement Fund, and that a copy of said map, duly certified by the Secretary of the Trustees, be filed in the office of the Commissioner of Agriculture.

"(Minutes of the Trustees of the Internal Improvement Fund, Vol. 7, pp. 66-67.)

"Tallahassee, Fla., June 14, 1907.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"The following resolutions were adopted:

"RESOLVED BY THE TRUSTEES OF THE IN-TERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA, That the townships, ranges and sections of the official map of the Everglades adopted by the Trustees under date of January 2, 1905, and as amended by resolution of said Trustees of June 10, 1907, embracing the lands in the United States Patent No. 137, be, and the same are hereby, adopted and ratified as the townships, ranges, and sections of said map, which townships, ranges, and sections, as the same appear to be designated upon said official map of the Everglades, were so designated and determined by projecting on said map the township, range, and section lines of the original United States survey as the same appear on said map, and that

the sections indicated on said official map of the Everglades, as adopted by the Trustees of the Internal Improvement Fund of the State of Florida, as aforesaid, be numbered similarly and under the same plan and system as sections are numbered under the township, range, and section system adopted by the United States, and of the same force and effect, beginning with Section 1 and continuing to Section 36, inclusive, fractional townships to be numbered under the same system, being designated by such numbers as will make them uniform with the system of the United States.

"These maps, as is clearly shown by the letter from the Commissioner of Agriculture, of January 2, 1905, quoted above, and from the acts of the Trustees, were made by drawing lines on paper protracted from points purporting to represent locations of Government survey corners and lines around the edge of the Everglades. It will be observed that the maps were not prepared from actual surveys, but were merely paper illustrations setting forth in ·a general way the lands contained in Patent No. 137, known as the Everglades. They did not represent in accurate detail the lands of the Everglades, nor were they intended so to do. The lands to be conveyed were subject to subsequent survey in the field, but pending this actual survey it was necessary to have some sort of map or plat, even though only an approximate one, which could be used to describe the lands of the Everglades and by which drainage taxes imposed by the Legislature upon the district could be assessed. An examination of these plats show that about as far as they went was to illustrate a land division by the usual methods of townships, ranges, and sections."

"Tallahassee, Florida, November 4, 1911.

"The Trustees of the Internal Improvement Fund met in the office of the Executive on this date:
"Present:

"Albert W. Gilchrist, Governor,

"A. C. Croom, Comptroller,

"W. V. Knott, Treasrurer,

"Park Trammell, Attorney General,

"B. E. McLin, Commissioner of Agriculture.

"The following preamble and resolutions relating to the survey of the lands embraced in U. S. Patent No. 137, known as the Everglades, was adopted:

"WHEREAS, The Trustees of the Internal Improvement Fund of the State of Florida did, on December 29, 1910, approve and adopt certain resolutions for surveying the land embraced in U. S. Patent No. 137, known as the Everglades; and

"WHEREAS, These instructions were based on the lines and corners established by the U. S. Survey of the adjacent territory, together with a map and resolution of the Trustees of the I. I. Fund, adopted June 11, 1907; and

"WHEREAS, The field notes, with few exceptions, of the U. S. Survey, show the townships abutting the Everglades to be 480 chains long on each side, and the sections to be one mile square; and

"WHEREAS, The official map adopted by the Trustees was predicated on the Government survey and field notes, and was supposed to give townships six miles square and sections one mile square, containing 640 acres each; and

"WHEREAS, It has been found by actual measurement that practically all the townships adjacent to the

land embraced in the Everglades Patent No. 137 are more than 480 chains long, and the sections are more than one mile square, and it being the desire and intention of the Trustees to have the sections contain 640 acres each, no more or less, if possible, therefore,

"BE IT RESOLVED, That the instructions heretofore issued be, and the same are hereby, amended so as to subdivide the lands embraced in the U. S. Patent No. 137 into townships six miles square, each township containing 36 sctions of 640 acres each, as near as may be, and that the surplus found to exist be placed as shown on the accompanying map as near as practicable; the object of the map being to show the general plan of the survey and the general distribution of the surplus, if any. Said map to be filed in the office of the Secretary of the Trustees.

''The Trustees then adjourned.

"ATTEST:

"ALBERT W. GILCHRIST, Governor.
"J. C. LUNING, Secretary."

"CHAPTER 7891—(No. 110.)

"AN ACT to Legalize and Validate All Land Surveys, Field Notes, Maps, and Plats Thereof, Made in this State by or Under the Direction of the Chief Drainage Engineer for the Trustees of the Internal Improvement Fund; to Validate and Confirm the Acts of the Trustees of the Internal Improvement Fund Pertaining to Such Surveys; and to Designate the Custodian for Such Plats, Field Notes and Maps of Survey.

"*Be It Enacted by the Legislature of the State of Florida:*

"Section 1. That all surveys of lands into townships, sections or other regular land divisions heretofore or hereafter made in this State, and which have or may be approved by the Chief Drainage Engineer for the Trustees of the Internal Improvement Fund, together with the Field Notes, plats, or other accessories pertaining thereto, are hereby validated and confirmed and are declared to be official public surveys of this State to be of equal force, tenor and effect as surveys made by or under the direction of the United States Government.

"Sec. 2. The provisions for land surveys as are herein provided shall only apply to such lands as have not heretofore been surveyed by the Federal Government, and all acts of the Trustees of the Internal Improvement Fund, together with any and all contracts, regulations and instructions relating to such surveys, be, and the same are hereby, approved, validated and confirmed.

"Sec. 3. That when such surveys shall have been made and approved by the Chief Drainage Engineer, the plats and field notes thereof shall be filed in the office of the Commissioner of Agriculture of this State, who shall be the custodian of such plats and field notes for the use of the public under such regulations as may apply to the use of plats and field notes of the Public Land Surveys of the United States, and a duly certified copy of same shall be admissible as evidence in any court of law or equity in this State.

"Sec. 4. All laws and parts of laws in conflict herewith be, and the same are hereby, repealed.

"Sec. 5. This Act shall take effect immediately on its passage and approval by the Governor.

"Approved June 7, 1919."

WHITFIELD, J., (*after making the foregoing statement.*)

This appeal is from a decree sustaining a demurrer, dissolving a preliminary injunction and dismissing a bill of complaint filed by the appellant corporations against the Clerk of the Circuit ·Court, the Trustees of the Internal Improvement Fund of Florida, the "Board of Commissioners of Everglades Drainage District," and the Governor, Comptroller, Treasurer, Attorney General and Commissioner of Agriculture of the State of Florida, "being said trustees and constituting said board." The purpose of the suit is to restrain the Clerk from disposing of the tax sale certificates held by him for the State covering complainants' described lands, to retain the Trustees and Board of Commissioners from taking title to or disposing of any of complainants' land, to annul the tax sales and tax certificates and to annul the liens for drainage, taxes and assessments levied under Chapter 6456, Laws of Florida, and the amendments thereto, on complainants' described lands, located within the Everglades Drainage District. The relief sought is predicated upon allegations designed to show invalidity of the acreage drainage taxes, in that taxes on the school lands in the district are not paid, and in that the protracted land lines within the district have been changed by an actual survey and such survey approved by law, Chap. 7892, Acts 1919, and in that the drainage of the lands in the district should be accomplished by the application of the proceeds of the swamp and overflowed lands in the Internal Improvement Fund, or that such fund should in effect be exhausted before a drainage tax is levied on the lands in the district, in that the management of the trust fund is complained of, the contention being that in view of the allegations such drainage taxes deny to the complain-

ants due process and equal protection of the laws in violation of the Federal and State Constitutions. These assertions ignore the considerations that no provision is made by law for the payment of taxes levied upon the State school lands, that the lands of the Internal Improvement Fund are to be utilized for various State-wide purposes and not alone for drainage purposes in a particular district constituting perhaps about one-fifth of the entire areas of swamp and overflowed lands in the State, to all of which lands throughout the State the general drainage laws may apply, and further that the assessment is an acreage tax upon lands in a vast area that when conveyed had not been surveyed in fact, only protracted lines from points of survey on each side having been traced upon plats and used in describing lands that actually exist in the district, but had not been definitely located or identified prior to actual survey or drainage, the intention being to convey a stated acreage to be located by authorized surveys. Besides this, the complainants do not observe the differences between the execution of a trust fund and the exercise by the State of its inherent police power.

The discretion of the Legislature when exercised for the public welfare in selecting the subjects of police regulations and in determining the nature and extent of such regulations is limited only by the requirements of the fundamental law that the regulations shall not invade private rights secured by the Constitution, and shall not be merely arbitrary in applying to some persons and not to others similarly conditioned. Davis v. Florida Power Co., 64 Fla. 246, 60 South. Rep. 759; Stewart v. DeLand-Lake Helen Special Road and Bridge Dist. in Volusia County, 71 Fla. 158, 71 South. Rep. 42.

The drainage and reclamation of swamp and overflowed lands are a proper exercise of legislative authority.

There is no express provision in the State Constitution as to special assessments for local improvements or as to the formation of taxing districts for particular purposes.   Lainhart v. Catts, 73 Fla. 735, 75 South. Rep. 47; Bannerman v. Catts, 80 Fla. 170, 85 South. Rep. 336.

Under Chapter 610, Laws of Florida, approved January 6, 1855, and the acts amendatory thereof, the Governor, Comptroller, Treasurer, Attorney General and Commissioner of Agriculture of the State of Florida constitute the Trustees of the Internal Improvement Fund of the State of Florida, whose powers and duties are State-wide and are prescribed by statutes of the State.

Under Chapter 5377, Acts of 1905, and amendments thereto, the same State officers compose the "Board of Drainage Commissioners," with statutory powers and duties relating to drainage extending throughout the State, there being originally over twenty million acres of swamp and overflowed lands in the State.

Under Chapter 6456, Acts of 1913, and the amendments thereto, the same State officers constitute the "Board of Commissioners of Everglades Drainage District," with corporate powers and designated duties as the "governing board of said district," which district comprises State lands aggregating about 4,000,000 acres in the extreme southern portion of the State.   Under the Constitution the designated State officers have their offices at Tallahassee, the Capital of the State, where they severally and collectively perform their official duties, but they may, and do officially visit, and transact their official business in other portions of the State as circumstances may re-

quire. The duties of the officers as State officials and as *ex officio* "Trustees" or "Commissioners" do not conflict but co-ordinate in rendering efficient service to the State within the authority conferred by law. The Clerk of the Circuit Court is by law the custodian of the tax sale certificates issued to the State or to its officers or agencies upon sales of lands for non-payment of taxes assessed against them. Pursuant to particular provisions of law, the Clerk of the Circuit Court may sell and transfer the tax sale certificates to purchasers thereof who may obtain deeds of conveyance of the lands based on the certificates, upon terms and conditions prescribed by the several statutes.

The five State officers acting as Trustees of the Internal Improvement Fund of the State of Florida are charged with the administration of the State trust fund, consisting of the swamp and overflowed lands and other lands granted to the State by the Congress, the trustees having powers to dispose of the lands and to apply the proceeds thereof or the lands in kind to drainage and other expressed purposes, subject to such limitations and regulations as may be prescribed by law for the execution of the statutory trust. This trust is State-wide in extent.

The same five State officers, acting as the "Board of Commissioners of the Everglades Drainage District," are authorized by statute to collect and expend an acreage tax in draining and reclaiming swamp and overflowed lands within a limited district defined by statute, the authority being exercised pursuant to the exertion by the Legislature of the sovereign police powers of the State to render fit for cultivation and occupancy immense acres of lands in the State that because of their original character are detrimental to the general welfare if not re-

claimed, but extremely valuable when rendered useful for occupancy and cultivation.

Reduced to final analysis, the contention is that because of the manner in which the Legislature and the State officers as Trustees have administered the statutory trust covering the swamp and overflowed lands granted by the United States to the State, "the proceeds of which lands, whether from sale or direct appropriation, in kind to be applied exclusively, as far as necessary, for the purpose of reclaiming said lands by means of levees and drains," the State is deprived of the right to exercise its inherent governmental power to enforce drainage assessments upon swamp and overflowed lands purchased from the Trustees of the Internal Improvement Fund.

The police power of the State inheres in its sovereignty and is subject only to applicable provisions of the Federal and State Constitutions designed to protect private rights from arbitrary and oppressive governmental action. It does not appear that the exercise of the State's inherent police powers in enforcing assessments upon lands for benefits to them by the drainage operations here considered has violated any of complainants' organic or fundamental rights. Even if complainants have justiciable rights in the administration of the Internal Improvement Fund, because of the purchase of lands from the Trustees of the Fund, such rights cannot stay the exercise by the State of its sovereign governmental powers to assess the lands for special purposes that are beneficial to the lands and conserve the general welfare.

The obligation of the State to use the proceeds of the swamp and overflowed lands for drainage purposes is to the United States and not to those who purchase the

lands from the State agencies. The proceeds of the Internal Improvement Fund when other authorized uses are satisfied may be made applicable to the drainage of all the swamp and overflowed lands in the State and not to those in one district, covering a part only of such lands. The Trustees have not been authorized to specifically pledge the trust fund to any drainage system or particular district, and so far as appears no such pledge by the Trustees has been attempted. The lands in this case were bought as swamp and overflowed lands, for an appropriate consideration for such lands, after the enactment of, and, of course, with full notice of, Chapter 5377, Acts of 1905, and the amendatory Act, Chapter 5709, Acts of 1907, imposing the levy of acreage drainage taxes on lands in the State that needed drainage, thus disclosing the policy of the State within its police powers. Likewise the lands were purchased with notice that all property in the State is acquired and held subject to the due exercise of the State's police power; and with notice that under the Constitution the sixteenth sections are school lands and inviolable; and that no provision of law is made to pay a tax levied upon school lands for any purpose; and also that under the Constitution 25% of the sales of public lands constitute a part of the inviolate State School Fund. The swamp and overflowed lands remaining in the State fund that are within the drainage district are taxed on a parity with other lands in the district that are privately owned. Lands of the trust funds are sold to pay the drainage tax as well as to meet expenses in the administration of the fund; and even if the fund was for the benefit of the district and not for the entire State, the allegations contain only conclusions or opinions that the State fund itself is sufficient for drainage purposes in the district, without any definite show-

ing of facts to sustain the asserted opinions and conclu-. sions. The Legislature and the State officers having charge of the fund necessarily have discretionary power as to the use of the fund, which is State-wide in its purposes; and the statutes referred to and the course of management alleged indicate a determination by the Legislature and the State officials that a drainage tax is needed to complete drainage operations in the district. The duty to apply the proceeds of swamp and overflowed lands to drainage purposes is not confined to the particular district, but extends to all parts of the State, the swamp and overflowed lands covered by the grant from Congress being located in practically every county of the State, though the larger parts thereof are in the southern portion of the State where the particular drainage district is, but not all in the district. The greater portion of the lands have by the Legislature been appropriated to purposes other than drainage; and the trusts are not yet completed, though the lands have largely been disposed of by legislative authority, most of which was done before the plaintiffs purchased lands, as shown by public acts and records.

The complainants purchased by stated descriptions within an immense area where the lands were more or less similarly conditioned; and even if the lands purchased by the complainants had been located or in any way identified or utilized in place, the change in or correction of errors in mere protracted lines cannot harm the complainants, they being required to pay assessments only on the acreage secured to them, and it does not appear that they have been deprived of any land purchased by them. Complainants purchased on an assumption that a section contained 640 acres and that a township contained 36 sections. The lands assessed and sold for non-payment of

assessment and claimed by the plaintiffs may be located by the descriptions used in making the assessments and sales. In adopting the plat used in making sales it was expressly stated that the protracted lines were made "without an actual survey." The survey of the lands made no material changes in the description and no change in the land bought by complainants, though the protracted lines may have included more land than was conveyed or intended to be conveyed by the descriptions used, a particular acreage within a large area being mutually intended. It is not claimed that the appropriate quantity of land does not exist under the descriptions as sold to the complainants or as assessed. Purchasers are not injured by a survey and change in the lines theoretically protracted upon plats of an immense unsurveyed and unoccupied area, all the land being of practically the same nature and the mutual intent being to locate the lands in contemplated acreage according to a survey that may be authorized by law. The assessment was made by the statute describing the lands. See Chap. 6456, Acts 1913.

It appears that the conveyances of complainants' lands were made by descriptions and that similar descriptions were used in making the acreage assessments. and even if all the land lines are not in fact located where they would supposedly be when they were first protracted on plats, yet if the complainants have their acreage by the proper description, as they seem to have, they cannot complain of an illegal acreage assessment, if it develops that there is in fact more lands within particular *protracted* lines than the complainants are entitled to under their conveyances. Nor can they complain of an illegal assessment if the lands to which they are entitled in a large area are not in fact located exactly where complain-

VOL. 81, JANUARY TERM, 1921.          111

Everglades Sugar & Land Co. et al. v. Bryan et al.—Opinion of Court.

ants supposed them to be. The lands sold were located by a survey that has been approved and validated by statute. Chapter 7892, Acts 1919. The assessment descriptions are apparently technically correct as made.

It is in effect alleged that the Drainage Commissioners have refunded to the Trustees money expended by the latter for drainage in the Everglades Drainage District; and that the Trustees have lands sufficient to complete the drainage in the district without the acreage taxes assessed. But the complainants overlooked the leading fact that the fund in the hands of the Trustees is subject to State-wide application within the discretion accorded to the Trustees by the statutes, and is not designed to be applied to any particular district at the instance of individuals. Lands are sold by the Trustees to pay the acreage drainage taxes on lands in the district held in trust fund; and to this extent at least the fund is appropriated to drainage operations in the particular district. See Sec. 5, Chap. 6456, Acts 1913; Chap. 6454, Acts 1913.

It does not appear that the Trustees or the Drainage Commissioners have not observed the law; and differences of opinion as to the proper administration of a statutory trust fund does not affect the right of the State to assert its police power to assess lands for drainage purposes to conserve the public good.

It is also alleged that no acreage drainage tax has been collected upon the sixteenth sections of land held by the State School Fund in the Drainage District. But the State has made no provision for paying taxes on lands belonging to the Public School Fund that is used for the benefit of all the people of the State. The complainants should have an interest in preserving this fund inviolate for public education as is expressly required by the Con-

stitution, under which organic law the complainants and all others are secured in their business and property and other material rights and privileges in the State. Public education affords a highly proper basis for just discriminations in selecting the subjects of taxation and of assessments for benefits. The Constitution expressly authorizes the exemption from taxation of property held for educational purposes. Sec. 1, Art. IX. See also 252 U. S. 12.

The non-payment by the State of acreage drainage taxes on the sixteenth sections of land within the drainage district, belonging to the State School Fund, does not invalidate the assessments against complainants lands.

The allegations as to the management and disposition of the trust fund designed for general drainage and other purposes covering the entire State, and the allegations as to the method by which the Drainage Commissioners may have reimbursed the Trustees for money advanced from the trust fund pursuant to statutory authority for drainage purposes in the district, do not afford a basis for decreeing a drainage tax levied under the police power, to be invalid.

If money is advanced by the Trustees pursuant to their authority, from the general trust fund for use in the district, and the amounts so advanced are credited on the acreage taxes assessed against the lands of the fund in the district, the complainant's assessments are not thereby invalidated; and such fact does not show an unjust discrimination against purchasers of swamp and overflowed lands in the district, since they have no special or peculiar rights in the trust fund that could affect the

right of the State under the police power to levy an acreage tax for drainage purposes in the district.

Even if the trust fund can be used only for the drainage purposes, such fund is as applicable to all of the other 16,000,000 acres of swamp and overflowed lands in the State as it is to the 4,000,000 acres in the district where complainants' lands are. And however the trust fund may be applied, the State's police power to drain by tax levies is not thereby affected. In the exercise of the police power the complainants are not unjustly discriminated against and there is no contention that they are not duly and equally benefited by the drainage operations that are paid for by a tax uniformly levied on an acreage basis.

Even if the Internal Improvement Fund is subject to use for draining lands that have been sold by the Trustees, the lands of the complainants and others in the particular district have no rights that are superior to those of other purchasers of such lands throughout the State. The trust cannot be pledged by the Trustees for use in any special drainage scheme or to drainage in any particular portion of the State. The administration of the trust fund is controlled by statutory regulations and statutes are subject only to paramount organic law. The statute here considered does not violate Federal or State organic law. While the discretion that is by law vested in the Trustees of the Internal Improvement Fund and in the Board of Drainage Commissioners will not be controlled by the courts, yet abuses of authority, if any, may be remedied by due course of law. No abuse of statutory powers appear here.

Successful drainage and reclamation of the immense areas of swamp and overflowed lands in different parts

of this State are designed by the law to be accomplished through designated administrative agencies that must of necessity have large discretionary authority to meet the peculiar conditions to be encountered in the performance of quite unusual duties, that involve enormous expenditures upon reclamation projects that perhaps have no precedents to guide, but upon their successful execution depend vast public and private interests affecting the entire State. The courts should not interfere unless the Constitution is being violated or private rights are invaded contrary to law and equity.

Affirmed.

BROWNE, C. J., AND TAYLOR, J., AND JONES AND PERKINS, CIRCUIT JUDGES, concur.

ELLIS AND WEST, J. J., disqualified.